STAN D. BOWLES DISTRIBUTING COMPANY v. PABST BREWING COMPANY

No. 858SC1154

(Filed 20 May 1986)

**1. Contracts § 29.2— breach of franchise agreement—right to sell product not exclusive—calculation of damages improper**

In an action to recover for breach of contract where defendant allegedly breached its franchise agreement with plaintiff by refusing to fill plaintiff's order for a particular product, the trial court erred in awarding plaintiff the sum of $195,000 as compensatory damages because the award was based on the erroneous assumption that plaintiff's right to sell the product in question was exclusive.

2. Contracts § 29.1— breach of franchise agreement—damages—consideration of margins of profit proper

   In an action to recover for breach of a beer franchise agreement, there was no merit to defendant's contention that the trial court erred in admitting into evidence and making findings of fact based upon or related to plaintiff's lost profits in violation of the parties' distributorship agreement that, "Under no circumstances shall [defendant] be liable for any loss of profits by distributor," since the trial court considered "margins of profit," that is, the price to defendant plus taxes and freight reduced by the selling price, while "lost profits" are usually defined as lost net profits with all costs being deducted.

   Judge PHILLIPS dissenting.

APPEAL by defendant from *Reid, Judge.* Judgment entered 7 June 1985 in Superior Court, WAYNE County. Heard in the Court of Appeals 6 March 1986.

Plaintiff, Stan D. Bowles Distributing Company (Bowles), is a North Carolina corporation that engaged in the wholesale distribution of alcoholic malt beverage products from 1975 to 1980. Defendant, Pabst Brewing Company (Pabst), is a national brewer "engaged in the manufacture and sale of Pabst beer and Pabst ale." On 23 January 1975 Bowles and Pabst entered into a written distributorship agreement granting Bowles "the right to sell Pabst beer and ale" in Wilson, Greene, Wayne and Lenoir counties.

In August 1979 Bowles placed an order with Pabst for 2,184 cases of Olde English 800 Malt Liquor, a product that Pabst had earlier acquired the right to sell. Pabst did not fill Bowles' order and granted the right to sell Olde English 800 to another distributor in the area, Jeffreys Beer and Wine Company (Jeffreys). Bowles then sued Pabst for breach of contract.

At trial, the court, sitting without a jury, found that Pabst had breached its agreement with Bowles by refusing to fill Bowles' order for Olde English 800 and awarded to Bowles $168,000 for the diminution in value of the franchise after breach and $150,000 in punitive damages. Pabst appealed the judgment and award to this Court. In *Bowles Distributing Co. v. Pabst Brewing Co.*, 69 N.C. App. 341, 317 S.E. 2d 684 (1984) we affirmed the trial court's findings and conclusion that Pabst breached its contract with Bowles. However, we reversed and vacated the

award of punitive damages and reversed and remanded the case for further proceedings on the issue of compensatory damages.

At retrial on the compensatory damages issue, judgment was entered in favor of Bowles in the amount of $195,000. Pabst appeals.

*Brown, Fox & Deaver by Bobby G. Deaver and Kornegay & Head by Janice S. Head for plaintiff-appellee.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan by Michael E. Weddington and Martha Jones Mason for defendant-appellant.*

EAGLES, Judge.

I

[1]   By its first assignment of error Pabst contends that the trial court erred in awarding to Bowles the sum of $195,000 as compensatory damages because the award is based· on the erroneous assumption that Bowles' right to sell Olde English 800 was exclusive. We agree.

On 24 January 1975 Bowles and Pabst entered into an amendment to the distributorship agreement which amended paragraphs two and four of the basic contract. Paragraphs two and four restricted the distributor's area of distribution to particular counties and provided that Pabst would not sell to other distributors within that territory. The amendment gave Pabst the right to sell its products to any distributor within Bowles' territory. In *Bowles, supra,* we held that the agreement required Pabst to sell Olde English 800 to Bowles but that the express terms of the agreement provided that Bowles' franchise rights with Pabst were not exclusive. Pabst breached its agreement with Bowles by refusing to sell Olde English 800 to Bowles, not by selling the product to Jeffreys. *Id.* at 349, 317 S.E. 2d at 689.

At the time of breach the Bowles distributorship consisted of a Champale franchise, a Country Club franchise and the Pabst franchise (which included three products—Pabst Blue Ribbon, Red, White and Blue, and Andeker). We held in *Bowles, supra,* that Pabst was liable only for the diminution in value of the Pabst franchise resulting from Bowles' inability to sell Olde English 800.

At retrial on the compensatory damages issue the trial court found as fact that the diminution in value equaled the difference between the value of the Pabst franchise with the ability to sell Olde English 800 less the value of the Pabst franchise without the ability to sell Olde English 800. In computing these values, the trial court adopted the method of evaluation used by Stan Bowles:

> [T]he Court finds, by the greater weight of the evidence, that one of the methods acceptable within the trade for evaluating beer wholesale franchises, is to base the offered sales price on a formula which provides that the estimated or actual sales of cases of beer for one year multiplied by its "margin-of-profit" ("margin-of-profit" being the difference between selling price to a retailer and the "laid in" costs to the wholesaler) multiplied by the "year factor" ("year factor" being negotiated according to the expected demand for the product to be distributed both present and future).

Using this formula the trial court made the following valuations:

> (7) The value of the Pabst franchise to the Plaintiff prior to the breach and without Olde English 800 was estimated at prior year sales of approximately 40,000 cases times the margin-of-profit of $1.81 per case; utilizing the acceptable formula within the trade, the Court finds its value to have been $70,000.00 at the time of the breach.

> (8) Utilizing the same formula and applying it to all of the evidence before the Court, the Court finds as a fact, by the greater weight of the evidence, that the value of the Pabst franchise, had it not been breached and had the Plaintiff the ability to distribute Olde English 800 Malt Liquor, to be $265,000.00. This sum was found from the evidence and by its greater weight by multiplying the sales for one year which the Court determines to be 100,000 cases times the margin-of-profit which the Court finds to be $2.12 per case times the year factor, which the Court finds to be one and one-quarter years.

The difference between these two values is $195,000 which represents the diminution in value of the Pabst franchise and is the amount awarded to Bowles as compensatory damages.

Since the court was sitting without a jury, these findings of fact "are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Williams v. Insurance Co.*, 288 N.C. 338, 342, 218 S.E. 2d 368, 371 (1975). There is sufficient evidence to support finding of fact number seven. Stan Bowles testified that prior year sales of Pabst products (Blue Ribbon, Red, White and Blue, and Andeker) totaled 40,000 cases with a margin of profit of $1.81 per case. There is not sufficient evidence to support finding of fact number eight. Both Stan Bowles and Robert Pohle, plaintiff's expert witness, testified that the estimated potential sales of Olde English 800 for one year were 128,806 cases at a margin of profit of $2.12 per case. Further, Mr. Bowles used a year factor of one and one-half years. Though there was no contradictory evidence, the trial court reduced total annual sales to 100,000 cases and reduced the year factor to one and one-quarter years. We are mindful that the trial court as finder of the facts may believe or disbelieve all or any part of the testimony of a witness, but we note that here there is no evidence of record to support modifications in the year factor or the annual sales estimate. In finding of fact number eleven the trial court does indicate that the projected sales of Olde English 800 were obtained from plaintiff's exhibit number eighteen. However, plaintiff's exhibit number eighteen, a Pabst Brewing Company Market Data Survey, shows that the number of cases of Olde English 800 sold within the four county area by Jeffrey's in 1980 was 116,317 cases. On the face of the judgment there is no other explanation for the figures used by the trial court and no other explanation as to why they were reduced.

Plaintiff's evidence consisted of the testimony of four witnesses, three of whom analyzed the diminution in value of the Pabst franchise. All three witnesses stated that their valuations were based on the assumption that Bowles had the exclusive right to sell Olde English 800 within the four county market area. However, we have already determined that Bowles' right was not exclusive. *Bowles, supra.* Therefore, plaintiff's evidence failed to take into consideration the effect of competition within the four county market area. For example, plaintiff's expert witness Pohle testified on cross-examination as follows:

Q. Now one of the assumptions that you have made, Mr. Pohle, in, in arriving at the valuations that you have testified to is that this right to distribute Old [sic] English 800 would be an exclusive right for that company; isn't it?

A. Yes, that's right.

Q. And if in fact it were a nonexclusive right, that would have, have an effect on your valuation; wouldn't it?

A. It certainly would. One of the—when we do evaluate a beer wholesalership among the things we give consideration to are the strength of the guy's, if you will, the beer wholesaler's franchise agreement, the strength of the franchise laws of the state and how well protected is he as a franchisee, how well protected is he as to the territory he covers and so on.

Q. And if it were a, a nonexclusive right, that would, would depress the valuation which you would arrive at; wouldn't it?

A. Well, it would. Yes.

Mr. Pohle further testified that he had not made any calculations of damages based upon the assumption of a nonexclusive right. When asked what he would have to do to make such a calculation Mr. Pohle responded:

That would be I think a relatively difficult thing to assess but I would want to know, I would imagine would be trying to arrive at some data which would give us an idea of how much of the share of the market that would be Old [sic] English could, could be maintained by this wholesalership versus the other wholesalership what would be distributing Old [sic] English. I don't know as that would be a particularly easy exercise but I certainly would want to dig into some data regarding both operations and their nature of their accounts and how well they cover their accounts and their percentage of the market and the, like how well they're set up to sell the product, what each person is going to devote to sale of product such as brand manager, present selling, what kind of other advertising they might put into the product, what other kind of promotional type of things they are going

to do in terms of discounting. Are they going to mark trucks, the usual things you do to, to market a brand of beer, which one would be more aggressive than the other or can one be more aggressive than the other.

Stan Bowles testified that he projected the selling price potential of Olde English 800 within his four county market area over a one and one-half year period to be $409,603.00. However, on cross-examination Mr. Bowles explained that his calculations were based on the assumption that only his company would be selling the product within that market area.

Q. Let me ask you this, Mr. Boles [sic], with respect to the, excuse me the computation, the computation that you made that's labelled selling price on Plaintiff's Exhibit No. 12, $409,603.00, that's based solely on one distributor selling that product; isn't it?

A. The 8 percent was based on all North Carolina.

Q. No, no, I mean the, that's what you contend it would have been worth if you had gotten Old [sic] English 800 and your company was the only one selling it; isn't that right?

A. It would have been worth at least that or more to me, yes.

Q. All right, sir, and that does not take into account in any way, does it, the fact that George Jeffreys Company was selling Old [sic] English 800 and would have been selling Old [sic] English 800 under its contract at the same time?

A. No, it does not.

Mr. Vassos an employee of Carlton Importing Company with eleven years experience in the beer and ale industry testified that he had reviewed the evaluation method used by Mr. Bowles and found it to be an acceptable method of evaluating a particular brand of beer or ale for sale within the industry. However, on cross-examination Mr. Vassos admitted that whether or not Bowles' right to sell Olde English 800 was exclusive would have an effect on the valuations.

Q. Now in, in making your evaluation, Mr. Vassos, and follow the, either the method you have described or the

method that you had demonstrated to you, there are some assumptions that you engage in in making those evaluations; aren't there?

A. Yes, there are.

Q. And one would be like brand potential? Brand potential is something that you have to make an informed horseback type judgment about; is that right?

A. Then that becomes a negotiation between the buyer and seller and what the buyer thinks it is worth and what the seller thinks it is worth.

Q. All right, and, and it also assumes that that particular brand is being sold by one wholesaler only in the market; doesn't it?

A. Yes. I'm trying to think. In general it does.

Q. And if there were more than one wholesaler selling the same brand in the market, it would freeze that price?

A. Correct, correct. If the brand were dual, meaning two wholesalers handling it in the same market place, it would freeze the selling price.

. . .

Q. In any event if two wholesalers in that particular market were handling the brand, then it would have dramatic effect on the valuation of the brand for either of them; wouldn't it?

A. Yes. Correct. I agree a hundred percent.

As to the fact that Bowles' right to distribute Olde English 800 was not exclusive, the trial court found as fact that:

(14) The Court carefully considered the Defendant's contention that the right to distribute Pabst products was nonexclusive. This portion was ably and strenuously argued by counsel; however, no evidence can be found that Pabst ever intended to exercise this contractual right. To the contrary, all the evidence tends to show that such was not the practice in North Carolina. The granting of the franchise to Jeffreys Beer and Wine Company of the right to distribute Olde Eng-

lish 800 rather than a joint franchise to both Jeffreys and the Plaintiff supports the Court's finding, by the greater weight of the evidence, that the non-exclusive provision in the franchise had not been exercised by Pabst.

Damages are never presumed and the burden is on the plaintiff to present evidence that supports the assessment of damages. *SNML Corp. v. Bank*, 41 N.C. App. 28, 254 S.E. 2d 274, *disc. rev. denied*, 298 N.C. 204 (1979). Bowles did not present any evidence that Pabst would have granted the right to distribute Olde English 800 to only one distributor within the four county market area. No representative of Pabst ever testified. The only evidence of record which relates to dual distributorships pertains solely to a purported custom in the beer industry that a manufacturer usually appoints only one distributor within a given area. However, in *Bowles, supra*, we held that industry customs do not control over the express terms of the contract. By the express terms of the contract between Pabst and Bowles, Pabst had the undisputed right to appoint more than one distributor within the four county area. The nonexclusive provision of the contract controls. It is an exercise in speculation to infer that because Pabst appointed Jeffreys and not Bowles that Pabst would not have created a dual distributorship in the area. "Provable damages must be reasonably certain and not rest upon doubt or speculation." *Chesson v. Container Co.*, 216 N.C. 337, 339, 4 S.E. 2d 886, 887 (1939). Plaintiff's evidence makes it clear that the issue of nonexclusivity would greatly affect the value of the Pabst franchise. However, there was no evidence before the trial court that valued the franchise in light of the fact that another distributorship was selling the same product within the same market area. Without this evidence there was no way for the trial court to accurately determine the value of the Pabst franchise with the ability to sell Olde English 800. Bowles must either prove that Pabst would not have created a dual distributorship or prove its damages taking into consideration the effect of competition in the market on the value of the Pabst franchise with the ability to sell Olde English 800. Accordingly, this assignment of error is sustained.

## II

[2] By its second assignment of error Pabst contends that the trial court erred in admitting into evidence and making findings of fact based upon or related to Bowles' lost profits. We disagree.

Paragraph eleven of the distributorship agreement between Pabst and Bowles provides in part: "Under no circumstances shall Pabst be liable for any loss of profits by distributor. . . ." We held in *Bowles, supra,* that the contract clearly prohibited an award for lost profits and that the trial court properly denied such an award. At retrial on the compensatory damages issue evidence was presented as to certain "margins of profit" from the sale of Pabst products. As explained by the attorney for Bowles, the margin of profit is the price to the brewery plus taxes and freight reduced by the selling price. It is an evaluation principle used in the industry to value a particular franchise and does not equate to whether a company is operating at a profit or a loss. Operating costs are not included. On the other hand lost profits damages are usually defined as lost net profits, with all costs being deducted. "For breach of contract, this means the contract price less cost of performance, or cost of completion, or, as it is sometimes put, 'expenses saved' as a result of being excused from performance by the other party's breach." R. Dunn, Recovery of Damages for Lost Profits Section 6.1 (2d ed. 1981).

The significance of the margins of profit in evaluating the value of the Pabst franchise was explained by Stan Bowles:

Q. (Mr. Deaver) Does the, does the margin of profit have any bearing on the value of the franchise, Mr. Bowles?

A. Yes.

Q. And how does it relate to it?

A. Well, a product that has a higher margin would be worth more.

Q. But it would be worth more if you had low volume or high volume?

A. It would be worth more if you had high volume.

Q. So you use this factor in conjunction with the volume of sales; do you not?

A. Certainly enters into it, yes.

Q. To determine the value of the franchise?

A. Of course.

Further, in ruling on Pabst's objections the trial court stated that evidence concerning profits and margins of profit was admitted for the limited purpose of valuing the Pabst franchise.

The trial court found as fact that:

(12) The Court considered carefully Defendant Pabst's argument that the evidence relating to damages rested essentially upon a lost profit theory and the Court recognizes that the law of the case expressly forbids awarding damages on lost profits; however, the Court finds that the *potential* for profit is an essential ingredient in determining the value of a beer franchise, but that the Court's award in this case is not an award for lost profits, but rather what this Court determined from the competent evidence to be a reasonable valuation of the damages sustained by the Plaintiff by reason of its inability to sell Olde English 800.

We hold that the trial court can properly consider "the potential for profit" as a factor in evaluating the values of the Pabst franchise with and without the ability to sell Olde English 800. The evidence presented supports the finding that the margins of profit were factors to consider in determining the value of the franchise. Bowles did not receive an award of damages for lost profits as proscribed by the distributorship agreement. Accordingly, this assignment of error is overruled.

### III

Having addressed those issues which dispose of the case on appeal, we find it unnecessary to consider Bowles' cross-assignment of error.

The judgment is vacated and remanded for further proceedings consistent with this portion of our opinion.

Vacated and remanded.

Judge ARNOLD concurs.

Judge PHILLIPS dissents.

Judge PHILLIPS dissenting.

In my opinion the evidence recorded supports the court's findings and judgment, and I would affirm. That the contract in question was non-exclusive and that Pabst had the right thereunder to establish competing dealerships, as was ruled in the previous appeal, does not mean to me, as it seemingly does to the majority, that Pabst *would have* established competing distributorships and that damages testimony not based thereon is, therefore, without foundation. The evidence that Pabst and other brewers customarily and usually did not maintain competing distributorships, though they had a right to do so, supports the finding, in my opinion, that competing dealerships would not have been established in this instance, and the expert testimony based on that premise supports the damages that the court awarded plaintiff. If the court had found that Pabst would have maintained competing dealerships the damages award would have no support; but the court did not so find, nor was it obliged to do so, in my opinion. Nor does it matter that no testimony was offered by or extracted from Pabst as to whether it would or would not have established competing dealerships, for such evidence would not have been binding on the fact finder in any event.