NO. COA13-841

NORTH CAROLINA COURT OF APPEALS

Filed: 4 March 2014

STATE OF NORTH CAROLINA

v.                                      Lenoir County
                                        No. 12CRS050866
THOMAS KEITH SUTTON,
    Defendant.


On writ of certiorari to review judgment entered on or about 22 January 2013 by Judge Paul L. Jones in Superior Court, Lenoir County. Heard in the Court of Appeals 12 December 2013.

> *Attorney General Roy A. Cooper, III, by Assistant Attorney General John P. Barkley, for the State.*
>
> *Public Defender Jennifer Harjo, by Assistant Public Defender Brendan O'Donnell, for defendant-appellant.*


STROUD, Judge.

Defendant appeals an order denying his motion to suppress and a judgment convicting him of felony carrying a concealed gun contending that his right "to be free from unreasonable search and seizure" was violated when a law enforcement officer frisked him without reasonable suspicion. (Original in all caps.) For the following reasons, we affirm.

I. Background

In October of 2012, defendant was indicted for two counts of "FELONY CARRYING A CONCEALED WEAPON[.]" On 11 January 2013, defendant filed a motion to suppress moving

> for an Order suppressing all evidence, alleged contraband, defendant's identity, and all statements and testimony concerning the alleged contraband, and as grounds therefore alleges that said material[] evidence, and testimony were seized in or obtained as a result of an illegal stop that occurred on March 27, 2012, absent reasonable and articulable suspicion in violation of his Fourth and Fourteenth Amendment rights under the United States Constitution and similar provisions in the North Carolina Constitution, Article 1, Section 19.

On 31 January 2013, the trial court denied defendant's motion to suppress finding as fact:

> 1) That the arresting officer, B. Wells, was employed by the Kinston Department of Public Safety as a police officer. Officer B. Wells has more than 10 years experience in that position. That he was assigned to the Special Response Unit and also served as a K-9 Officer. That as a member of the Special Response Unit he was assigned to patrol public housing units located within the city of Kinston, North Carolina.
>
> 2) That prior to March 27th, 2012, the Special Response Unit patrolled public housing, along with a task force made up of US Marshals and Drug Enforcement Agency, concentrating on viol[ent] crimes, gun crimes, etc. That in the past officers have been assaulted by

individuals in public housing. That officer B. Wells is trained in the detection of drugs, weapons and other general policing tactics.

3) At 14:34 hours (2:34pm) in the afternoon of March 27, 2012, officer B. Wells was patrolling near Simon Bright Apartments, which is one of the public housing apartments located in Kinston. Officer Wells had prior experience hearing shots fired on the East Bright Street area near Simon Bright Apartments. That the Kinston Department of Public Safety enforces a ban list of over 9 pages of individuals who are banned from public housing.

4) That on the day in question officer B. Wells was driving a Ford Crown Victoria vehicle with the windows down where he was listening and looking for criminal activity. While in the 800 block of East Bright Street Wells observed the defendant on McDaniel Street, who was walking normally while swinging his arms. That the defendant was carrying a Styrofoam food container in his left hand.

5) The Court finds as soon as the defendant starting turning east on Shine Street, he used his right hand to grab his waistband to clinch an item. The Court finds that this was an overt act which gave reasonable suspicion to the Public Safety Officer.

6) That officer B. Wells thought the defendant was trying to hide something and his posturing made it apparent that he was concealing something on his person. That the defendant then began to look specifically at the officer in

question, that the reaction of the defendant created some urgency to stop to determine who the defendant was and that he needed to be identified. The Officer then turned around his vehicle without lights and siren and stopped the defendant for questioning.

7) That prior to being frisked, the officer did not draw a weapon or use any type of force on the defendant. That he asked the defendant if he was carrying a weapon and he doesn't remember the response of the defendant. That the officer performed a Terry Frisk upon the defendant. A gun was found on the defendant tucked in his waistband.

8) That the defendant never stated to the Officer that he was carrying a weapon. That the defendant was not handcuffed and the Officer did not have a weapon drawn. That the entire process took probably less than a minute or two. That the weapon in question was a Ruger P89 .9mm handgun with a magazine and 7 rounds of ammo, but there was no round which was chambered inside the weapon in question.

The trial court concluded:

1) That the stop of the defendant was legal and did not violate Federal and State Constitutional Standards. That the detaining Officer gave reasonable and articulable grounds for stopping the defendant that resulted in his being frisked.

2) That the rights of the defendant . . . were not violated and therefore evidence seized may be presented before

the Jury at trial. That the behavior and actions of the defendant as well as the totality of the circumstances form a further basis for Denying the Motion to Suppress.

3) The Court has examined the Ruger handgun in court for size, weight and concealability to determine if it was consistent with suppression testimony. The Court finds that both federal and state courts have given patrol officers wide latitude to stop and frisk defendants based upon an articulable suspicion.

4) The Court finds that the entire process of frisking the defendant took less than 2 minutes for an investigatory stop. The Court finds the Motion to Suppress is Denied.

On or about 22 January 2013, the trial court entered a judgment against defendant for carrying a concealed gun based upon defendant's guilty plea; defendant received a suspended sentence and was placed on 24 months of supervised probation. Defendant appeals.

## II. Petition for Writ of Certiorari

In his plea transcript defendant reserved his right to appeal "the interlocutory order entered in the above-captioned case on January 22, 2012, denying his motion to suppress the March 27, 2012 stop." In open court, defendant's attorney stated "that he would like to appeal the interlocutory order

entered in this matter today[.]" Defendant never appealed from his judgment, but he subsequently filed a petition for a writ of certiorari with this Court because he had failed to properly appeal from his judgment within the time period allotted. This Court stated in *State v. Franklin*,

> All of defendant's issues on appeal are concerning his motion to suppress, but since defendant did not file a notice of appeal from the judgment or after entry of the written order denying his motion to suppress, we must first address whether we have jurisdiction to consider defendant's appeal. In *Miller*, this Court stated,
>
>> N.C. Gen. Stat. § 15A-979(b) (2009) states that: An order finally denying a motion to suppress evidence may be reviewed upon an appeal from a judgment of conviction, including a judgment entered upon a plea of guilty. Defendant has failed to appeal from the judgment of conviction and our Court does not have jurisdiction to consider Defendant's appeal. In North Carolina, a defendant's right to pursue an appeal from a criminal conviction is a creation of state statute. Notice of intent to appeal prior to plea bargain finalization is a rule designed to promote a fair posture for appeal from a guilty plea. Notice of Appeal is a procedural appellate rule, required in order to give this Court jurisdiction to hear and decide a case. Although Defendant preserved his right to appeal by filing his written

>notice of intent to appeal from the denial of his motion to suppress, he failed to appeal from his final judgment, as required by N.C.G.S. § 15A-979(b).
>
>Accordingly, the Court dismissed defendant's appeal. Here, however, while defendant has not properly provided notice of appeal, he has petitioned this Court for a writ of certiorari to consider his appeal. North Carolina Rule of Appellate Procedure 21(a) provides,
>
>>The writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action, or when no right of appeal from an interlocutory order exists, or for review pursuant to N.C.G.S. § 15A-1422(c)(3) of an order of the trial court denying a motion for appropriate relief.
>
>Pursuant to Rule 21(a), we grant defendant's petition for a writ of certiorari and will consider the issues presented in his brief as he lost his right to appeal by failure to take timely action.

___ N.C. App. ___, ___, 736 S.E.2d 218, 220 (2012) (citations, quotation marks, and brackets omitted). Accordingly, we grant defendant's petition for certiorari.

### III. Standard of Review

Our review of a trial court's denial of a motion to suppress is strictly limited to determining whether the trial judge's

> underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law. The trial court's conclusions of law are fully reviewable on appeal.

*State v. McKinney*, ___ N.C. App. ___, ___, 752 S.E.2d 726, 727-28 (2014) (citations, quotation marks, and ellipses omitted).

## IV. Findings of Fact

Defendant challenges portions of findings of facts 5 and 6 as not supported by the competent evidence and also contends that portions of these findings of fact are actually conclusions of law.

## A. Findings of Fact Supported by Competent Evidence

As to all of defendant's challenges regarding competent evidence to support the findings of fact, much of his argument is devoted to the credibility of the evidence and not necessarily to its absence. But the credibility of the evidence is a determination made by the trial court; "the trial court as finder of the facts *may believe or disbelieve all or any part of the testimony of a witness*," *Bowles Distributing Co. v. Pabst Brewing Co.*, 80 N.C. App. 588, 592, 343 S.E.2d 543, 545 (1986) (emphasis added). This Court reviews findings of fact only to determine if there was competent evidence to support them, not

whether *all* of the evidence supported them. *See McKinney*, ___ N.C. App. at ___, 752 S.E.2d at 727, *Bowles Distributing Co.*, 80 N.C. App. at 592, 343 S.E.2d at 545.

It is said that a picture is worth a thousand words. In this case, a picture would be worth several thousand words, since the testimony in this case, the trial court's order, and other cases all necessarily use words to the very brief movements, glances, and body language that tend to form the basis for many a *Terry* stop. Lacking a picture of that moment when Officer Wells observed defendant grabbing at his waistband or side on 27 March 2012, we will address defendant's arguments as to each of these facts.

Defendant challenges the portion of finding of fact 5 that stated defendant "used his right hand to grab his waistband to clinch an item" because "Officer Wells' repeated testimony is that the defendant clinched his side . . . but he did not ever testify that the defendant grabbed his waistband." Defendant also argues that Officer Wells did not "testify that the defendant clinched 'an item.'" Defendant's arguments are hyper-technical. Clutching, clinching, and grabbing are all words which describe the same sort of movement and a person's waistband crosses his "side." Officer Wells testified that

defendant "clutch[ed] his right side at this time. And it was very distinct, a clinched fist as well as almost like trying to hold something on his body" and that the way defendant "was clinching his side" is the reason he "believe[d] the waistband would be of interest[.]" Accordingly, Officer Wells' testimony supports the challenged portions of finding of fact 5.

Defendant also challenges the portion of finding of fact 6 stating, "That the defendant then began to look specifically at the officer in question[.]" Defendant directs our attention to portions of Officer Wells' testimony which he asserts show that defendant did not "specifically" look at him. It is true that it is nearly impossible to know for certain if another person is actually looking at a particular thing — the observer can tell only if it *looks* like they are looking at it. Here the evidence shows that that is how defendant looked to Officer Wells. Officer Wells testified that as defendant "rounded . . . his turn . . . it was almost like he was surprised to see me and kind of, you know, postured up[;]" "he saw me kind of slow patrol[;]" and "[i]f he did make eye contact with me it was so quick. But it was more like he panned around me in my direction and then kind of -- I know he saw me for a fact that he saw me. He had to have seen me[.]" Officer Wells' testimony supports a

finding of fact that defendant "look[ed] specifically at the officer in question[.]" The challenged portion of finding of fact six does not state that defendant and Officer Wells made eye contact but only that defendant specifically saw Officer Wells, and Officer Wells' testimony supports this finding of fact.

Defendant further challenges the portion of finding of fact six that provides, "The Officer then turned around his vehicle without lights and siren and stopped the defendant for questioning." Defendant specifically states in his brief that he "agrees that the evidence supports a finding that the officer stopped him and that the officer did so without the patrol car's lights or siren. It is inaccurate, however, to say or suggest that the officer stopped the defendant only for questioning." Thus, defendant only challenges that there was competent evidence to support Officer Wells' mental intent for stopping defendant. Defendant contends that Officer Wells' true intent was not just to question but also to search defendant. Officer Wells testified that he "was going to stop [defendant] and identify who he was and see what he was trying to hide on [that] right side." Officer Wells' testimony supports a finding of fact that his intent was to question defendant, since he would

presumably ask defendant his identity. "Questioning" defendant to identify him and frisking him to find out what he was trying to hide does not mean that Officer Wells planned to do a more extensive search than would be appropriate based upon reasonable suspicion. Though the finding of fact could have been more artfully written or could have contained more details about the specific types of questions Officer Wells intended to ask, the general statement that defendant was stopped "for questioning" is supported by competent evidence. Accordingly, Officer Wells' testimony supports the challenged portions of finding of fact 5. These arguments are overruled.

B. Findings of Fact as Conclusions of Law

Defendant also contends that portions of findings of fact 5 and 6 are actually conclusions of law. To the extent that defendant is correct, we will review them as such. *See State v. Jackson*, ___ N.C. App. ___, ___, 727 S.E.2d 322, 329 (2012) ("We will review conclusions of law *de novo* regardless of the label applied by the trial court." (citation and quotation marks omitted)).

V. Reasonable Suspicion

Defendant contends that the trial court did not "have reasonable suspicion, based on specific and articulable facts,

that the individual is involved in criminal activity" to justify stopping and frisking defendant. Defendant's argument is difficult to summarize in a logical manner because he essentially takes each separate finding of fact or even portions thereof and argues that each finding in isolation does not create reasonable suspicion. It would be extremely difficult to find reasonable suspicion in any case if it had to be supported by each individual fact taken in isolation. But "[t]he concept of reasonable suspicion is not readily, or even usefully, reduced to a neat set of legal rules. Rather, in determining if reasonable suspicion existed, *the Court must account for the totality of the circumstances—the whole picture*." *State v. Knudsen*, ___ N.C. App. ___, 747 S.E.2d 641, 650-51 (emphasis added) (citations, quotation marks, and ellipses omitted), *disc. review denied*, ___ N.C. ___, 749 S.E.2d 865 (2013). As such, we will set forth all of the findings of fact and address them as a whole. *See id.* at ___, 747 S.E.2d at 651. Furthermore, defendant also suggests that this Court can essentially make its own findings of fact based upon the uncontested evidence before the trial court and supplement the trial court's findings of facts for a "whole picture[.]" This is incorrect, as

> [o]ur review of a trial court's denial
> of a motion to suppress is *strictly limited*

> *to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.* The trial court's conclusions of law are fully reviewable on appeal.

*McKinney*, ___ N.C. App. at ___, 752 S.E.2d at 727-28 (emphasis added).

Defendant first contends that he was "seized;" this is true, but merely the start of the analysis. *See State v. Fleming*, 106 N.C. App. 165, 169, 415 S.E.2d 782, 784 (1992) ("When defendant approached Officer Williams, the officer immediately began to pat him down while simultaneously asking him questions. Thus, Officer Williams applied actual physical force to defendant's person and this action constituted a seizure. *Id. See also Terry v. Ohio*, 392 U.S. 1, 20 L.Ed. 2d 889 (1968). (When a law enforcement officer takes hold of an individual and pats down the outer surface of his clothing, he has seized that individual within the meaning of the Fourth Amendment.) Accordingly, the Fourth Amendment is applicable to the facts and circumstances in this case." (quotation marks omitted)).

The fact that defendant was "seized" then leads to consideration of the reasonableness of this seizure, considering

all of the circumstances as

> [t]he Constitution does not prohibit all searches and seizures; it only protects against unreasonable searches and seizures. Since Officer Williams' conduct did not rise to the level of a traditional arrest requiring probable cause, his conduct must be measured in light of the reasonableness standard established in *Terry v. Ohio*. A brief investigative stop of an individual must be based on specific and articulable facts as well as inferences from those facts, viewing the circumstances surrounding the seizure through the eyes of a reasonable cautious police officer on the scene, guided by his experience and training. Law enforcement officers are required to have reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.

*Id.* at 169-70, 415 S.E.2d at 785 (citations and quotation marks omitted).

> In order to conduct a warrantless, investigatory stop, an officer must have reasonable and articulable suspicion of criminal activity.
>> The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. The only requirement is a minimal level of objective justification, something more than an unparticularized suspicion or hunch.
>
> The officer's reasonable suspicion must arise from his knowledge prior to the time of the stop.

*State v. Blankenship*, ___ N.C. App. ___, ___, 748 S.E.2d 616, 618 (2013) (citations, quotation marks, and brackets omitted).

Defendant argues, based on several different cases which he contends are on point with this case, that Officer Wells did not have reasonable suspicion to frisk him. But since the determination in each case may differ on the subtlest of facts, and lacking a picture of the moment each defendant was stopped in these cases as well, we have analyzed the cases identified by defendant with consideration of both the facts and law, which we have set out in verbatim fashion in order to emphasis these differences without unnecessary further commentary. Given the wealth of binding authority in North Carolina regarding defendant's appeal we need not consider the persuasive authority presented by defendant. Defendant first compares this case to *Fleming* wherein

> several Greensboro police officers were in the vicinity of the Ray Warren Homes housing project. The officers were members of a tactical division and were operating a drug suppression program in the project on this date. Officer J. Williams, a veteran officer of seventeen years and a member of the tactical division, described the Ray Warren Homes project as an area where numerous arrests for drug violations had been made and where crack cocaine and other contraband was sold on a daily basis. At approximately 12:10 a.m., Officer Williams observed

defendant and another black male standing in an open area between two apartment buildings located on Best and Rugby Streets. When first observed, defendant and his companion were standing in the open area looking at the officers located on Best Street. Officer Williams was out of his vehicle at the time talking to the other officers. Officer Williams further testified that the gentlemen stood there and they watched us for a few minutes, and then the defendant and the other young man turned and started walking towards Rugby Street out of the area.

When the two young men started walking the other way, Officer Williams got into his vehicle and drove around to Rugby Street where the gentlemen were walking out from between two buildings. He then observed the defendant and the other male walking on the sidewalk along Rugby Street towards him. Officer Williams told the court he had never seen either of the two young men in the area of the housing project. On cross examination, he admitted he decided to stop them because he had never seen them. Officer Williams got out of his vehicle and asked them to hold it a minute. At this time, defendant and the other male were approximately 35 to 40 feet from the officer. Defendant turned right towards Best Street, and Officer Williams said, Come here. Defendant hesitated for approximately one minute, then both young men complied and approached the officer.

Officer Williams testified that when defendant approached he acted real nervous. Officer Williams asked them to identify themselves and they both complied; neither were residents of the Ray Warren Homes project. When questioned about why he was in the area, defendant stated a friend had dropped him off and he was walking through. When asked if the conversation with

> defendant was before he patted him down, Officer Williams responded, I was talking to him as I was patting him down. Officer Williams felt an object in defendant's underwear while he was patting him down. Officer Williams testified that when he asked defendant what the object was, defendant replied crack cocaine. Pursuant to Officer Williams' instructions, defendant subsequently removed the object and placed it on Officer Williams' car hood.

*Fleming*, 106 N.C. App. at 166-67, 415 S.E.2d at 783 (quotation marks omitted). The defendant made a motion to suppress which the trial court subsequently denied. *Id.* at 168, 415 S.E.2d at 784. Defendant appealed. *Id.* This Court stated in its analysis,

> at the time Officer Williams first observed defendant and his companion, they were merely standing in an open area between two apartment buildings. At this point, they were just watching the group of officers standing on the street and talking. *The officer observed no overt act by defendant at this time* nor any contact between defendant and his companion. Next, the officer observed the two men walk between two buildings, out of the open area, toward Rugby Street and then begin walking down the public sidewalk in front of the apartments. These actions were not sufficient to create a reasonable suspicion that defendant was involved in criminal conduct, it being neither unusual nor suspicious that they chose to walk in a direction which led away from the group of officers. At this time, Officer Williams stopped defendant and his companion and immediately proceeded to ask them questions while he simultaneously

patted them down.

We find that the facts in this case are analogous to those found in *Brown*. Officer Williams had only a generalized suspicion that the defendant was engaged in criminal activity, based upon the time, place, and the officer's knowledge that defendant was unfamiliar to the area. Should these factors be found sufficient to justify the seizure of this defendant, such factors could obviously justify the seizure of innocent citizens unfamiliar to the observing officer, who, late at night, happen to be seen standing in an open area of a housing project or walking down a public sidewalk in a high drug area. This would not be reasonable.

Considering the facts relied upon by the officer, together with the rational inferences which the officer was entitled to draw therefrom, we conclude they were inadequate to support the trial court's conclusion that Officer Williams had a reasonable articulable suspicion that defendant was engaged in criminal activity.

*Id.* at 170-71, 415 S.E.2d at 785-86 (emphasis added) (quotation marks omitted). While many of the facts in *Fleming* are the same or similar to this case, in *Fleming*, the defendant did not make any overt actions, *id.* at 170, 415 S.E.2d at 785, and here defendant did when he "used his right hand to grab his waistband to clinch an item."

Defendant also directs this Court's attention to *In Re J.L.B.M.*, wherein

on patrol at approximately 6:00 p.m. on 6 July 2004, Officer D.H. Henderson (Officer

Henderson) responded to a police dispatch of a suspicious person at an Exxon gas station in Burlington, North Carolina. The only description given of the person was Hispanic male. Officer Henderson saw a person in the gas station parking lot, later identified as the juvenile, who fit the description of the person. When the juvenile saw Officer Henderson, he walked over to a vehicle in the parking lot, spoke to someone, and then began walking away from Officer Henderson's patrol car. Officer Henderson pulled up beside the juvenile in an adjoining restaurant parking lot and stopped the juvenile. Upon getting out of the patrol car and speaking with the juvenile, Officer Henderson noticed a bulge in the juvenile's pocket. Officer Henderson patted down the juvenile for weapons. Officer Henderson found and seized a dark blue, half-empty spray can of paint and a box cutter with an open blade.

176 N.C. App. 613, 615-16, 627 S.E.2d 239, 241 (2006) (quotation marks omitted). This Court held

that in the present case, like in *Fleming*, the stop was unjustified. Officer Henderson relied solely on the dispatch that there was a suspicious person at the Exxon gas station, that the juvenile matched the Hispanic male description of the suspicious person, that the juvenile was wearing baggy clothes, and that the juvenile chose to walk away from the patrol car. Officer Henderson was not aware of any graffiti or property damage before he stopped the juvenile, and he testified that he noticed the bulge in the juvenile's pocket after he stopped the juvenile.

*Id.* at 622, 627 S.E.2d at 245 (quotation marks omitted).

However, unlike in the present case, *in In re J.L.B.M.*, the defendant was not in an area known for "viol[ent] crimes [and] gun crimes[;]" the defendant did not change his actions upon seeing a law enforcement officer, and the defendant took no actions which made law enforcement believe "defendant was trying to hide something and . . . made it apparent that he was concealing something on his person." *Id.* at 616, 627 S.E.2d at 241. In *In re J.L.B.M.*, the law enforcement officer did not even notice the defendant was concealing something until "*after* he stopped" him. *Id.* at 622, 627 S.E.2d at 245. (emphasis added) Accordingly, *In re J.L.B.M.*, is distinguishable from the present case.

Defendant also directs our attention to cases where "this Court has found some physical mannerisms to be a factor supporting reasonable suspicion, but only in combination with facts that point to actual criminal activity." Here, we have both a high crime area and movements by defendant which Officer Wells found suspicious. The very location of where defendant was walking was an area so ridden with crime that it was patrolled by a Special Response Unit in which Officer Wells served, which was a part of "a task force made up of US Marshals and [the] Drug Enforcement Agency" in order to "concentrate[e]

on viol[ent] crimes [and] gun crimes[.]" Furthermore, "[o]fficers have been assaulted in the area, Officer Wells has personally heard shots fired in the area, and "the Kinston Department of Public Safety enforces a ban list of over 9 pages of individuals who are banned from public housing." Accordingly, these circumstances coupled with defendant's own actions are factors in a reasonable suspicion analysis. *See State v. Watson*, 119 N.C. App. 395, 398, 458 S.E.2d 519, 522 (1995) ("[A]n officer's experience and training can create reasonable suspicion. Defendant's actions must be viewed through the officer's eyes. Our Supreme Court has also noted that the presence of an individual on a corner specifically known for drug activity and the scene of multiple recent arrests for drugs, coupled with evasive actions by defendant are sufficient to form reasonable suspicion to stop an individual." (citations omitted); *see generally State v. Butler*, 331 N.C. 227, 233-34, 415 S.E.2d 719, 722 (1992) (noting cases where a high crime area has been a factor in determining reasonable suspicion).

Defendant further contends that "because carrying a concealed weapon with a valid permit is not illegal in North Carolina" reasonable suspicion is "undermined" in this case. Defendant essentially argues that since a person carrying a

concealed weapon may also have a permit to carry it legally, a law enforcement officer cannot assume that a person who appears to have a weapon concealed is doing so illegally. Yet defendant's argument is undermined by North Carolina General Statute § 14-415.11, which addresses exactly what an individual is required to do if he is legally carrying a concealed weapon and he is approached by a law enforcement officer:

> Any person who has a concealed handgun permit may carry a concealed handgun unless otherwise specifically prohibited by law. *The person shall carry the permit together with valid identification whenever the person is carrying a concealed handgun, shall disclose to any law enforcement officer that the person holds a valid permit and is carrying a concealed handgun when approached or addressed by the officer*, and shall display both the permit and the proper identification upon the request of a law enforcement officer.

N.C. Gen. Stat. § 14-415.11 (2011). (emphasis added) Thus, a person who is carrying a concealed weapon legally has an affirmative obligation to disclose this fact and that he has a permit to an officer "when approached or addressed by the officer." *Id.*

Here, Officer Wells approached defendant and addressed him, but there is no indication that defendant informed him at any time that he had any legal right to carry a concealed weapon,

nor is there any evidence that defendant had a valid concealed carry permit. The trial court made a finding of fact, which is not challenged by defendant, "[t]hat the defendant never stated to the Officer that he was carrying a weapon." Since North Carolina General Statute § 14-415.11 requires any person who is carrying a concealed weapon legally to disclose this fact when he is "approached" by a law enforcement officer, and defendant did not make this disclosure, Officer Wells had no reason to assume that any gun defendant may have tucked into his waistband was legally carried. *See id.* In fact, just the opposite would be true: if defendant was legally carrying a gun, Officer Wells would expect that he would immediately disclose this information when he approached defendant and his failure to do so would raise *more* suspicion that he was carrying the weapon illegally.

The binding unchallenged findings of fact and those we have already determined are supported by competent evidence, *see Peters v. Pennington*, 210 N.C. App. 1, 13, 707 S.E.2d 724, 733 (2011) ("Unchallenged findings of fact are binding on appeal."), support the conclusion that Officer Wells had reasonable suspicion of criminal activity. Defendant was in a public housing area that was patrolled by a Special Response Unit and "a task force made up of US Marshals and [the] Drug Enforcement

Agency" in order to "concentrat[e] on viol[ent] crimes [and] gun crimes[.]" Officer Wells was a police officer with ten years of experience and was assigned to the Special Response Unit where his responsibilities included patrolling the public housing area. "[O]fficers have been assaulted" in this area. Many individuals -- a list of at least nine pages -- are banned from the public housing area. On a prior occasion Officer Wells had heard shots fired near the area where he was patrolling on 27 March 2012. On 27 March 2012, Officer Wells saw defendant "walking normally while swinging his arms." Defendant turned and "used his right hand to grab his waistband to clinch an item" which "was an overt act[ion.]" Officer Wells believed "defendant was trying to hide something and his posturing made it apparent that he was concealing something on his person." Defendant "look[ed] specifically at" Officer Wells, and defendant's reaction created an "urgency to stop" defendant in Officer Wells in order to identify defendant. Officer Wells turned his vehicle around, without lights or siren, to stop defendant in order to ask him questions. Officer Wells did not draw a weapon or use any type of force with defendant nor did he handcuff defendant, though he did frisk defendant and found a gun in defendant's waistband.

The State's arguments were based on several other cases, but we will not address these as we find *Fleming* to be more similar than those presented by the State. In *Fleming*, as in this case, the law enforcement officers were experienced officers involved with a specific law enforcement team assembled to address a specific crime problem in a specific area. *Fleming*, 106 N.C. App. at 166, 415 S.E.2d at 783. In *Fleming*, Officer Williams was a seventeen year veteran officer and a "member[] of a tactical division . . . operating a drug suppression program" in the vicinity of a housing project where the defendant was seized; *id.* at 166-67, 415 S.E.2d at 783, here, Officer Wells was a ten year veteran officer and "was assigned to the Special Response Unit . . . assigned to patrol public housing units . . . along with a task force made up of US Marshals and [the] Drug Enforcement Agency" in order to "concentrat[e] on viol[ent] crimes [and] gun crimes[.]" In *Fleming*, this Court concluded that Officer Williams did not have reasonable suspicion to seize the defendant because "at the time Officer Williams first observed [the] defendant and his companion, they were merely standing in an open area between two apartment buildings. At this point, they were just watching the group of officers standing on the street and talking. The

officer observed no overt act by defendant[.]" *Id.* at 170, 415 S.E.2d at 785. This case is different, as Officer Wells saw defendant "walking normally while swinging his arms[,]" but then he turned and "used his right hand to grab his waistband to clinch an item" which "was an overt act[ion.]" Officer Wells believed "defendant was trying to hide something and his posturing made it apparent that he was concealing something on his person." Defendant "look[ed] specifically at" Officer Wells, and defendant's reaction "created some urgency to stop" defendant in Officer Wells in order to identify defendant. Here, the trial court specifically found that defendant engaged in a specific action, "grab[bing] his waistband to clinch an item[,]" which made Officer Wells believe "defendant was trying to hide something and his posturing made it apparent that he was concealing something on his person." Furthermore, defendant looked at Officer Wells in such a way that his reaction "created some urgency" in Officer Wells that defendant needed to be identified in a high crime area where a list of at least nine pages of individuals were banned. Accordingly, we conclude that the findings of fact do support a conclusion of reasonable suspicion on the part of Officer Wells to stop and frisk defendant as due to the high crime area, Officer Wells'

experience and knowledge of the area, and defendant's behavior, Officer Wells had a reasonable suspicion both to stop defendant and frisk him for weapons. *See generally State v. Rinck*, 303 N.C. 551, 559, 280 S.E.2d 912, 919 (1981) ("If from the totality of circumstances, a law enforcement officer has reasonable grounds to believe that criminal activity may be afoot, he may temporarily detain an individual. If upon detaining the individual, the officer's personal observations confirm that criminal activity may be afoot and suggest that the person detained may be armed, the officer may frisk him as a matter of self-protection." (citations omitted)). As such, the trial court properly denied defendant's motion to suppress, and defendant's argument is overruled.

## VI. Conclusion

For the foregoing reasons, we affirm.

AFFIRMED.

Judges HUNTER, JR., Robert N. and DILLON concur.