ZACHARY, Judge.
 

 *506
 
 Defendant Damien Aaron White appeals (1) from the trial court's order denying his Motion to Dismiss his charge of first-degree rape, and (2) from the trial court's order enrolling him in satellite-based monitoring. Because we conclude that the State presented sufficient evidence to withstand Defendant's
 
 *118
 
 Motion to Dismiss his first-degree rape charge, we affirm the trial court's denial of the Motion to Dismiss. Because the trial court did not conduct a hearing to determine whether it would be constitutional to subject Defendant to satellite-based monitoring upon
 
 *507
 
 his release, we vacate the trial court's order enrolling Defendant in satellite-based monitoring, and remand for a hearing on this matter.
 

 Background
 

 Defendant was indicted for first-degree rape and was tried before a jury beginning on 30 May 2017. The victim could not remember the incident, and thus was unable to testify that she had been raped or that Defendant was the one who had raped her. Rather, the evidence at Defendant's trial tended to show the following:
 

 The victim was out with several of her friends one night in downtown Wilmington. The victim and Defendant had never met each other prior to this time. At approximately 1:30 a.m., the victim and her friend Eddie were talking when a man-whom Eddie was "six out of ten" sure was Defendant-approached the victim. The victim and the man walked away together. Ten minutes later, the victim's friend Katherine ran into the victim. The victim eventually walked away from Katherine, at which point a man-whom Katherine was "95 percent confident" was Defendant-asked Katherine if the victim was okay.
 

 Later in the evening, Jean and John, strangers to the victim, were walking downtown when they heard a woman screaming for help. Jean and John ran toward the screams and came upon a man in an alley "straddling" the victim, "in like a missionary position." John threw the man off of the victim, and recalled that he could "clearly see [the man] pulling his pants up" and that the man had an erection. The man said, "It's not what it looks like," and another individual yelled out, "He raped her, call the police." The man then took off running. John and another male ran after the man while Jean stayed with the victim, who had been left on the ground with her pants and underwear pulled down to her ankles.
 

 Officer Benjamin Galluppi was on duty near the scene when he saw Defendant being chased by two males. Officer Galluppi was able to detain Defendant, whose pants were undone. Jean and John participated in a show-up identification of Defendant shortly thereafter. Jean was "a hundred percent sure," and John had no "doubt in [his] mind," that Defendant was the man that they had just seen straddling the victim in the alley.
 

 The victim was taken to the emergency room where she was examined by Wendy Bledsoe, an emergency room nurse and expert in sexual assault examination. In addition to having sustained a concussion and various injuries to her head, neck, and forearm, Nurse Bledsoe testified that she found "debris and a small black hair inside the vagina on one
 
 *508
 
 of the [victim's] vaginal walls" that was "most consistent with a pubic hair." The victim did not have pubic hair. The victim's sexual assault kit was tested, but no sperm or semen was found. A DNA sample was taken from the victim's underwear and revealed one profile matching the victim's DNA and another "minor profile." However, the profile not belonging to the victim "was inconclusive due to insufficient quality and quantity of DNA present" on the underwear.
 

 Defendant also testified at trial as follows: Defendant went downtown that evening to go out with friends but could not get into any bars because he did not have his identification. Accordingly, he spent most of the evening talking to his friends outside in the street and walking around trying to find a bar into which he could gain admission without identification.
 

 At one point Defendant walked to a parking garage in order to urinate. Afterward, Defendant recalls seeing the victim:
 

 [T]here was a young woman [the victim] who was walking down the street. You could definitely tell she had been drinking and everything. She was stumbling as she was walking. She could walk but she was stumbling and everything, and she had walked up and interlocked her arm with mine, and I smiled at her and she smiled at me and we kept walking down the street.
 

 *119
 
 And I'm walking back ... and I think we got maybe like maybe a block and a half ... and she had seen two other male gentlemen that I assumed she knew and she separated from me and went to them and interlocked between them two and I looked at them. I asked did they have her, was everything fine, they said yeah, they had her and they went off across the street in the opposite direction and I went further down. I said okay and kept going. That was it. I continued walking.
 

 Defendant came across the victim once again later in the evening:
 

 ... I was walking up the street and then there is an alleyway that was to my right and on the side of the street that I was walking on, there was hardly anybody or anything on it, so I wanted to get to the other side where it was more populated and where I could see more people and try to find some area because at that point I didn't know where I was at.
 

 *509
 
 And so as soon as I turned down the alleyway, right at the very beginning of the alleyway, there was a dumpster and right there was a young woman out like exposed, laying on her side.... [A]nd so I knelt down in front of her to ask her if she was all right or if she needed anything or any kind of help and as soon as I got her attention, she turns and looks at me and at that point I could tell that this is the same young woman who I had seen earlier.
 

 She starts to scream, "Get away from me nigger, get away from me, nigger," over and over again. So I'm like moderate reaction, just like, whoa, and I stand up and ... as soon as I stand up, it's almost immediately I see fists and people are trying to attack me and I didn't know what was going on in that situation.
 

 The first thought is, I mean, I'm in unfamiliar territory, I don't know what's going on and I'm being attacked. And so my initial thought was to leave, get away from the situation, so that's what I did, I ran.
 

 Defendant testified that Officer Galluppi possibly saw that his pants were unzipped because he had just gone to the bathroom, and that "I do have a habit of maybe leaving a fly undone, so it is quite possible that I didn't zip my pants back up afterwards." Defendant testified that he never pulled his pants off or down that evening, but that he does like to wear his pants "loose," and that if he "ever ha[s] to bend over or to pick something up, sit down for too long or kneel down for anything, once I stand up I have to readjust my pants."
 

 Finally, Defendant testified that he did not rape the victim, did not attempt to rape the victim, did not pull her pants down, and did not "ever touch her in any manner other than attempt to assist her."
 

 Defendant's trial counsel moved to dismiss the first-degree rape charge for insufficient evidence. The trial court denied Defendant's Motion to Dismiss and the jury subsequently convicted Defendant of first-degree rape. The trial court sentenced Defendant to 240 to 300 months' imprisonment and ordered that he enroll in satellite-based monitoring for the remainder of his natural life upon his release from prison. The trial court ordered Defendant to enroll in satellite-based monitoring without first having conducted an inquiry into whether doing so would constitute a permissible Fourth Amendment search.
 

 *510
 
 Defendant appealed from his conviction in open court and filed written notice of appeal from the trial court's order enrolling him in satellite-based monitoring. On appeal, Defendant argues (1) that the trial court erred in denying Defendant's motion to dismiss his first-degree rape charge for insufficiency of the evidence, and (2) that the trial court erred in ordering lifetime satellite-based monitoring without first conducting a hearing on its constitutionality.
 

 Motion to Dismiss
 

 The standard of review on a motion to dismiss is well established:
 

 When reviewing a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines whether the State presented substantial evidence in support of each element of the charged offense. Substantial evidence is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion.
 

 *120
 
 In this determination, all evidence is considered in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence. The defendant's evidence, unless favorable to the State, is not to be taken into consideration, except when it is consistent with the State's evidence, the defendant's evidence may be used to explain or clarify that offered by the State. Additionally, a substantial evidence inquiry examines the sufficiency of the evidence presented but not its weight, which is a matter for the jury. Thus, if there is substantial evidence-whether direct, circumstantial, or both-to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.
 

 State v. Hunt
 
 ,
 
 365 N.C. 432
 
 , 436,
 
 722 S.E.2d 484
 
 , 488 (2012) (citations and emphasis omitted).
 

 "The test of the sufficiency of the evidence on a motion to dismiss is the same whether the evidence is direct, circumstantial, or both."
 
 State v. Bullard
 
 ,
 
 312 N.C. 129
 
 , 160,
 
 322 S.E.2d 370
 
 , 388 (1984) (citation omitted). Where the State's evidence of the defendant's guilt is circumstantial, "the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually
 
 *511
 
 guilty."
 
 State v. Rowland
 
 ,
 
 263 N.C. 353
 
 , 358,
 
 139 S.E.2d 661
 
 , 665 (1965) (citation omitted).
 

 In order to survive a motion to dismiss a charge of first-degree rape, the State must present sufficient evidence that the defendant "engage[ed] in vaginal intercourse with another person by force and against the will of the other person[.]"
 
 N.C. Gen. Stat. § 14-27.21
 
 (a) (2017). "The slightest penetration of the female sex organ by the male sex organ is sufficient to constitute vaginal intercourse within the meaning of the statute."
 
 State v. McNicholas
 
 ,
 
 322 N.C. 548
 
 , 556,
 
 369 S.E.2d 569
 
 , 574 (1988) (citing
 
 State v. Williams
 
 ,
 
 314 N.C. 337
 
 ,
 
 333 S.E.2d 708
 
 (1985) ).
 

 In the instant case, Defendant argues that the trial court erred when it denied his Motion to Dismiss because the State failed to present sufficient evidence (1) that the perpetrator engaged in vaginal intercourse with-
 
 i.e.
 
 , "penetrated"-the victim, and (2) if so, that Defendant was the perpetrator. We disagree.
 

 The evidence to which the State points in support of the trial court's denial of Defendant's Motion to Dismiss tended to show that the victim was heard screaming "Help, help me." The scream was "absolutely not" a joke: "It was a distress, it was-it was scary. It was you knew something was seriously wrong." When Jean and John ran toward the sound of the victim's screams, they "saw a man straddling" the victim "in like a missionary position," at which point John "ran up to him and I threw him off of her and he stands up." John testified that when he pushed the man off of the victim, "I'm watching his hands and I can clearly see him pulling his pants up[.]" The man looked "like a deer caught in headlights ... like in shock, like standing there[,]" and "had an erection." The victim's "underwear and her pants were all the way to the ankle." Jean testified that someone yelled, "Call the police, he raped her," at which point the man "took right off. As soon as that was said, he was gone." Jean testified that the victim was crying and "kept thanking me," and that, "I'm a mom, I just-I knew she went through something, I just held her."
 

 In addition, Nurse Bledsoe found "debris and a small black hair inside the vagina on one of the [victim's] vaginal walls" that was "most consistent with a pubic hair." The victim did not have pubic hair. The following exchange took place between Nurse Bledsoe and the State regarding the debris and hair found inside the victim:
 

 Q. In your training and experience, Ms. Bledsoe, if a female sits on a beach without bathing suit bottoms, for example, would the sand go up inside her vaginal canal?
 

 *512
 
 ...
 

 A. No.
 

 *121
 
 Q. In your training and experience, if a female goes swimming and, say, is not wearing bathing suit bottoms, if there is debris in the water, would that go up inside that female?
 

 ...
 

 A. No.
 

 Q. And if a female sits on a paved alley that has dirt and debris all over it, just by sitting there would that dirt and debris be pulled up by the vaginal canal?
 

 ...
 

 A. No.
 

 Q. And why is that?
 

 ...
 

 A. The typical state of the vaginal walls, as I mentioned earlier, are collapsed in their normal state, they're collapsed and they only open up if something is introduced inside of them.
 

 The victim's friend Eddie identified Defendant as the man that he saw with the victim roughly thirty minutes before the assault took place to a sixty-percent degree of certainty. Ten minutes after Defendant was identified as being with the victim, the victim's friend Katherine testified that a man came up to her and asked if the victim was okay. Katherine identified Defendant as the person she spoke to that night with "95 percent confiden[ce]." Officer Galluppi observed Defendant running away from the scene of the assault and being chased by John and the other male. Officer Galluppi apprehended Defendant. At show-up identifications of Defendant shortly thereafter, Jean was "a hundred percent sure" that Defendant was the man who she saw straddling the victim, and John had no "doubt in [his] mind" that Defendant was the man whom he had thrown off of the victim.
 

 "Considered in the light most favorable to the State, a reasonable juror could have inferred from this evidence" (1) that the victim was vaginally penetrated against her will, and (2) that Defendant was the perpetrator of that assault.
 
 Hunt
 
 ,
 
 365 N.C. at 440
 
 ,
 
 722 S.E.2d at 490
 
 (citation omitted). Defendant's arguments pertaining to the discrepancies and
 
 *513
 
 inconsistencies in the evidence go to the evidence's weight rather than its sufficiency and were thus matters to be resolved not by the trial judge, but by the jury.
 
 Hunt
 
 ,
 
 365 N.C. at 436
 
 ,
 
 722 S.E.2d at 488
 
 . Accordingly, the trial court properly denied Defendant's Motion to Dismiss the first-degree rape charge.
 

 Satellite-Based Monitoring
 

 Our General Assembly has enacted "a sex offender monitoring program that uses a continuous satellite-based monitoring system ... designed to monitor" the location of individuals convicted of certain sex offenses after they are released from prison.
 
 N.C. Gen. Stat. § 14-208.40
 
 (a) (2017).
 

 The United States Supreme Court has held that [this] program constitutes a search for purposes of the Fourth Amendment.
 
 Grady v. North Carolina
 
 , 575 U.S. ----, ----, [
 
 135 S.Ct. 1368
 
 , 1370-71]
 
 191 L.Ed.2d 459
 
 , 462 (2015) [ ("
 
 Grady I
 
 ") ]. As such, North Carolina courts must first "examine whether the State's monitoring program is reasonable-when properly viewed as a search"-before subjecting a defendant to its enrollment.
 
 Id
 
 . at ----, [
 
 135 S.Ct. at 1371
 
 ]
 
 191 L.Ed.2d at 463
 
 . This reasonableness inquiry requires the court to analyze the "totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations."
 
 Id
 
 . at ----, [
 
 135 S.Ct. at 1371
 
 ]
 
 191 L.Ed.2d at 462
 
 .
 

 State v. Greene
 
 , --- N.C. App. ----, ----,
 
 806 S.E.2d 343
 
 , 344 (2017). The State bears the burden of proving that enrollment in satellite-based monitoring is a permissible Fourth Amendment search of each particular defendant targeted.
 
 State v. Blue
 
 ,
 
 246 N.C. App. 259
 
 , 264-65,
 
 783 S.E.2d 524
 
 , 527 (2016) ;
 
 State v. Morris
 
 ,
 
 246 N.C. App. 349
 
 , 352,
 
 783 S.E.2d 528
 
 , 530 (2016). This Court recently addressed the framework governing the constitutionality of satellite-based monitoring orders in
 
 State v. Gordon
 
 , No. COA17-1077, --- N.C. App. ----, --- S.E.2d ---- (filed Sept. 4, 2018),
 
 State v. Griffin
 
 , No. COA17-386, --- N.C. App. ----,
 
 818 S.E.2d 336
 
 (filed Aug. 7, 2018), and on remand from
 
 Grady I
 
 in
 
 State v. Grady
 
 , --- N.C. App. ----,
 
 817 S.E.2d 18
 
 (2018) ("
 
 Grady II
 
 ").
 

 *122
 
 In the instant case, after judgment was entered, the trial court ordered Defendant to enroll in satellite-based monitoring for the remainder of his natural life. The trial court did so despite not having held a hearing or having made a determination on the constitutionality of that search. The trial court simply concluded that, "in regard to
 
 *514
 
 satellite-based monitoring, that upon release from imprisonment, the defendant shall enroll in satellite-based monitoring for the rest of his natural life." The State had not yet offered any evidence in support of the constitutionality of the satellite-based monitoring of Defendant after Defendant's eventual release from prison. Defendant cited
 
 Grady I
 
 and objected to the constitutionality of the satellite-based monitoring program, which the trial court stated was "so noted and those objections are denied." Defendant filed proper written notice of appeal.
 

 It is clear that the trial court erred when it ordered Defendant to enroll in satellite-based monitoring upon his release from prison without first holding a hearing in order to determine whether doing so would be in compliance with the Fourth Amendment.
 
 Blue
 
 , 246 N.C. App. at 264-65,
 
 783 S.E.2d at
 
 527 ;
 
 Morris
 
 , 246 N.C. App. at 350-51, 783 S.E.2d at 529-530. In light of this deficiency on the part of the trial court, the State concedes that this Court should vacate the satellite-based monitoring order and "remand this issue to the trial court to provide the parties an opportunity to offer evidence and arguments regarding [satellite-based monitoring] and for the trial court to make findings as" to its constitutionality. Defendant, however, cites
 
 Greene
 
 ,
 
 supra,
 
 and argues that the appropriate remedy is for this Court to reverse the satellite-based monitoring order without remanding for a hearing. Defendant's application of
 
 Greene
 
 is misplaced.
 

 In
 
 Greene
 
 , there was a hearing in the trial court.
 
 Greene
 
 , --- N.C. App. at ----,
 
 806 S.E.2d at 344
 
 . The State put forth scant evidence in support of the constitutionality of satellite-based monitoring and both parties presented arguments on the matter.
 

 Id.
 

 The defendant filed a motion to dismiss the State's application for satellite-based monitoring, but the trial court concluded that the State's evidence had established that satellite-based monitoring constituted a reasonable Fourth Amendment search of the defendant.
 

 Id.
 

 The defendant appealed, arguing that "the State's evidence was insufficient to establish" the trial court's finding "that the enrollment constituted a reasonable Fourth Amendment search[.]"
 

 Id.
 

 The State conceded that
 
 the evidence it presented at the hearing
 
 was insufficient.
 

 Id.
 

 We thus concluded that the matter "ended there[,]" and that the State was therefore not "permitted to 'try again' " by presenting additional evidence at a second hearing.
 

 Id.
 

 at ----,
 
 806 S.E.2d at 345
 
 . The defendant's motion to dismiss should have been granted.
 

 Id.
 

 In the instant case, there was no hearing. The trial court did not afford the State an opportunity to present evidence in order to establish the constitutionality of enrolling Defendant in satellite-based monitoring. Because no evidentiary hearing was held on the matter whatsoever,
 
 *515
 
 we are unable to review the propriety of enrolling Defendant in lifetime satellite-based monitoring.
 
 Cf.
 

 Gordon
 
 , No. COA17-1077, --- N.C. App. ----, --- S.E.2d ---- (filed Sept. 4, 2018). Accordingly, we must remand the matter to the trial court in order to conduct a hearing, at which time the State will be required to establish the constitutionality of subjecting Defendant to continuous location monitoring for the remainder of his natural life upon Defendant's eventual release from prison. After allowing the State an opportunity to satisfy this arduous burden and after hearing arguments from both sides, the trial court must make its Fourth Amendment determination after having explicitly analyzed the "totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations[,]" in light of this Court's recent opinions in
 
 Gordon
 
 ,
 
 Griffin
 
 , and
 
 Grady II
 
 ,
 
 supra
 
 .
 
 Grady
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1371
 
 ,
 
 191 L.Ed.2d at 462
 
 . The remand hearing will be the State's sole opportunity to present evidence that ordering Defendant to enroll in satellite-based monitoring for the remainder of his natural life after Defendant has been released from prison will constitute a permissible search
 
 *123
 
 under the Fourth Amendment.
 
 Greene
 
 , --- N.C. App. at ----,
 
 806 S.E.2d at 345
 
 .
 

 Conclusion
 

 The trial court's order denying Defendant's Motion to Dismiss is affirmed. The trial court's order enrolling Defendant in satellite-based monitoring is vacated and remanded for the purpose of conducting an evidentiary hearing consistent with this Opinion.
 

 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 

 Judges ELMORE and HUNTER, JR. concur.