McGEE, Chief Judge.
 

 *498
 
 Jonathan Lopez ("Defendant") appeals from judgment entered after a jury found him guilty of second-degree rape. Defendant argues the trial court erred by (1) denying his motion to dismiss the charge for insufficient evidence, (2) excluding testimony of his expert witness, and (3) providing inadequate jury instructions. Defendant further contends the cumulative effect of these errors deprived him of a fair trial. We hold the trial court did not err in denying Defendant's motion to dismiss, did not prejudicially err in excluding Defendant's expert witness, and did not err in its instructions to the jury. As we hold the trial court did not commit prejudicial error, we hold that Defendant is not entitled to a reversal based on cumulative error.
 

 Defendant also appeals from the trial court's order imposing lifetime satellite-based monitoring ("SBM"). Defendant argues the trial court erred in ordering lifetime SBM because the State failed to present evidence that lifetime SBM of Defendant was a reasonable Fourth Amendment search. We hold that the trial court erred in ordering lifetime SBM, and reverse the trial court's order.
 

 I.
 
 Factual & Procedural History
 

 Miranda,
 
 [1]
 
 a college student studying business administration in Virginia, traveled to Raleigh with her friend, Perla, on 4 July 2014 to attend her godmother's vow renewal the following day. At the time, Miranda was twenty-two years old and had been in a relationship with her boyfriend for four-and-a-half years.
 

 In the days leading up to the vow renewal, Miranda exchanged text messages with Defendant, a close family friend who lived in Raleigh. Miranda and Defendant agreed to meet while in Raleigh. Miranda considered Defendant "even as a brother to [her]." Miranda testified that, on one occasion when Defendant and Miranda were in their early teens,
 
 *499
 
 they kissed during a game of "truth or dare." Miranda testified that, on another occasion when they were approximately sixteen years old, Defendant attempted to "hit on" Miranda, and she "blew it off." However, with the exception of those two instances,
 
 *501
 
 Miranda and Defendant never engaged in a romantic relationship.
 

 The night before the vow renewal, Miranda and Perla drove to Defendant's apartment and, on their drive, they drank mixed drinks consisting of vodka and juice. At approximately 6:00 p.m., they arrived at Defendant's apartment (hereafter at times, "the apartment"), which Defendant shared with Jose Oswaldo Palacios-Martinez ("Lenny"). At the apartment, Miranda drank a Mike's Hard Lemonade, a Fireball shot, and a mixed liquor drink. A while after arriving at the apartment, Miranda, Perla, Defendant, and Lenny decided to go to a club. Lenny drove the group to the club.
 

 At the club, Miranda and Perla separated from Defendant and Lenny, and each had another drink, and danced with each other. In the subsequent hours, Miranda drank a "Blue Motorcycle" - purchased by Defendant - and one and one-half shots of tequila. Miranda appeared drunk to Perla. Miranda testified that she had blurry vision, began to stumble, and was unable to send a text message. Miranda told Perla that she wanted to leave the club so she could go to sleep. After midnight, Defendant, Lenny, Perla, and Miranda left the club, and Miranda threw up in the parking lot of the club. Miranda texted her boyfriend, but was unable to recall any other detail from the drive back to Defendant's apartment.
 

 Upon arriving back at Defendant's apartment building, Miranda went up the stairs to Defendant's third floor apartment, holding onto the stair rail and wearing one shoe, and Defendant followed. Perla and Lenny remained in the parking lot, and Perla began to throw up. Lenny waited with Perla and, once Perla felt better, Lenny helped her up the stairs. Perla then fell asleep in the living room of the apartment.
 

 Miranda testified she awoke the following morning at 8:00 a.m. and felt another person's leg touching her leg. Miranda realized Defendant was in bed next to her. Miranda's shirt was off, her skirt was pushed up to her waist, and her underwear was on the bed. Miranda testified that her vagina felt sore, as if she had had sex. Defendant woke up and asked Miranda if she was okay. Miranda ignored Defendant, grabbed her phone, and ran out of Defendant's bedroom. Miranda testified she had a blurry memory of pushing or kicking someone off of her while she was sleeping.
 

 Perla testified she awoke in the morning to hear Miranda frantically asking why she had been left alone with Defendant. Miranda then
 
 *500
 
 walked out of the apartment to her car where she began crying. Perla called Miranda's cell phone, and Miranda told Perla that she thought "something had happened." Perla then questioned Defendant about what had happened the previous night, and Defendant assured Perla that nothing had happened. Miranda sent Perla a text message stating she wanted to leave, and she returned to the apartment to retrieve her things. Defendant asked Miranda again if she was okay and offered for her to use his shower.
 

 Miranda and Perla left Defendant's apartment and drove to a family friend's house. Perla testified that Miranda appeared "frazzled" in the car. Miranda told Perla that she woke up without her underwear, and Perla convinced Miranda to return to Defendant's apartment to confront him.
 

 Miranda and Perla drove to Defendant's apartment where, again, Defendant denied having sex with Miranda. Miranda explained to Defendant that her vagina felt sore. Defendant asked to speak with Miranda privately. Once in private, Defendant told Miranda that when he entered his bedroom and saw Miranda in his bed with her skirt pulled up to her waist, he instinctively "wanted to do something." He explained that Miranda kicked and pushed him off, so he left her alone.
 

 Miranda and Perla decided to leave Defendant's apartment. As they walked out of the apartment, Defendant invited Miranda and Perla to a party that he was hosting that night and joked that he would lock Miranda and Perla in his room to assure nothing bad happened to them. Miranda and Perla drove back to Virginia. Perla testified that on the drive, Miranda appeared "upset and confused and didn't really know where to go or what to do after that."
 

 *502
 
 The following afternoon, Perla called Miranda. Perla recommended Miranda seek medical attention and complete a rape kit, and they agreed to meet at a hospital in Woodbridge, Virginia. After waiting hours in the emergency room without being seen, Perla and Miranda drove to a pharmacy to purchase Plan B.
 

 Miranda called Defendant on speakerphone from the car and again asked what had happened on the night of 4 July. Defendant denied anything happened. Miranda explained that she was parked in front of a hospital, where the doctors and nurses would be able to ascertain the last time she had sex. Miranda threatened that, if Defendant had lied to her and her rape kit revealed she had had sexual intercourse, she would go to the police. Defendant inquired whether Miranda was alone, and Miranda said yes. Defendant then admitted he had sex with Miranda. Miranda began to cry and told Defendant she had not given
 
 *501
 
 him permission to touch her. Defendant said, "it's me. Why would you feel disgusted?" Defendant urged Miranda not to contact the police. After they hung up the phone, Defendant repeatedly called and texted Miranda saying, "we need to talk." Miranda responded one time, saying: "How could you do this to me? I trusted you. You were considered my friend."
 

 After speaking with Defendant, Miranda and Perla returned to the emergency room, and Miranda completed a rape kit. An off-duty security guard interviewed Miranda, filled out a police information report, and had Miranda and Perla each fill out written statements. The case was dispatched to an officer of the Raleigh Police Department on 7 July 2014. The officer contacted Miranda, received her oral statement, and prepared a report, which he passed on to the Raleigh Police Department's Detective Division.
 

 Detective Corinne McCall ("Detective McCall") of the Raleigh Police Department's Special Victims Unit testified that she was assigned the case on 8 July 2014. Detective McCall contacted Miranda by phone and asked Miranda "to tell [her] what had happened." Detective McCall's testimony regarding Miranda's story to her was consistent with Miranda's testimony at trial. Detective McCall testified that Miranda's story remained consistent throughout the course of the investigation.
 

 Detective McCall testified she interviewed Defendant on 25 July 2014, and recorded the interview. Initially, Defendant told Detective McCall that, on 5 July, when Miranda confronted him at his apartment, he told Miranda that the two had engaged in sexual intercourse the previous night. Defendant also told Detective McCall that he had not talked to Miranda since that day in his apartment when he disclosed to her that they had had sex. Defendant later admitted that he actually first told Miranda that they had had sex during a phone conversation on 6 July 2014. Detective McCall received Miranda's phone records, which revealed that Defendant lied about not contacting Miranda.
 

 In August 2014, Miranda returned to school. However, she struggled to concentrate in class and had periodic emotional outbursts that required her to leave campus. Although she only had six months left to graduate, she dropped out of school approximately three weeks later. Perla testified that, prior to 4 July 2014, Miranda had been "a very upbeat and a very happy girl"; however, after that date, "[Miranda] kind of became very depressed."
 

 In 2015, Miranda was transported to the hospital after attempting suicide by cutting her wrists. Miranda attempted suicide a second
 
 *502
 
 time by overdosing on pills and was again transported to the hospital. Miranda subsequently started treatment with a therapist once a week and was prescribed antidepressants and sleep medication.
 

 At trial, Defendant testified on his own behalf. He described his relationship with Miranda as "friends with benefits." Defendant testified that, on one occasion, during a game of "spin the bottle," Miranda kissed him and danced on top of him and, on another occasion, Miranda touched his penis.
 

 Defendant testified that on 4 July 2014, he went to a club with Miranda, Perla, and Lenny. Defendant could not recall how much alcohol he consumed at the club. Defendant explained he could not recall any detail about leaving the club or about the drive back to
 
 *503
 
 the apartment because of the three year lapse.
 

 Defendant further testified that, after returning from the club on the night of 4 July, Defendant went out on his balcony and smoked a cigarette. Defendant entered his room and saw Miranda sleeping in his bed. Defendant told Miranda to move, as she was lying on his side of the bed. Miranda woke up and moved over. About thirty minutes later, Defendant's leg touched Miranda's leg. Defendant put his hand on Miranda's back, and Miranda said, "yes." Defendant then said, "let's f---," and they had sex. The following morning, at approximately 7:00 a.m., Defendant and Miranda had sex for the second time. Miranda then went to the bathroom and left Defendant's apartment.
 

 Defendant testified that after Miranda came back in the apartment, Miranda and Perla entered Defendant's room, and asked Defendant whether he had engaged in sex with Miranda the previous night. Defendant denied anything happened. Defendant testified: "I cannot tell you why at that moment I opted not to tell her." Defendant testified when Miranda and Perla returned to his apartment later that afternoon and again asked him what had transpired, Defendant denied anything happened, because he "just didn't know what to do."
 

 Defendant was indicted on 20 March 2017 for one count of second-degree rape. The case came on for hearing 27 March 2017. The jury found Defendant guilty of second-degree rape on 30 March 2017. Defendant was sentenced to 73-148 months' imprisonment. Defendant was ordered to register as a sex offender for his lifetime and to enroll in an SBM program. Defendant appeals.
 

 *503
 
 II.
 
 Appellate Jurisdiction and Writs of
 
 Certiorari
 

 As an initial matter, this Court's jurisdiction must be determined. Defendant has filed two petitions for writ of
 
 certiorari
 
 ; we address each in turn.
 

 Defendant was convicted of second-degree rape and sentenced to 73-148 months' imprisonment on 30 March 2017. After receiving the jury verdict, but prior to the pronouncement of the judgment, the defense attorney gave oral notice of appeal and asked for the appointment of the Appellate Defender. The trial court noted the request on the record and dismissed the jury. When the jury returned, the trial court accepted the verdict of the jury and ordered that it be recorded as a final judgment. Subsequently, appellate entries were filed, and the Appellate Defender was appointed to represent Defendant. Defense counsel filed the record on appeal in this Court on 9 January 2018. Defendant filed a petition for writ of
 
 certiorari
 
 , pursuant to Rule 21(a) of the North Carolina Rules of Appellate Procedure on 20 February 2018.
 
 See
 
 N.C. R. App. P. 21(a) (2018).
 

 Rule 4 of the North Carolina Rules of Appellate Procedure provides that notice of appeal from a criminal action may be taken by: "(1) giving oral notice of appeal at trial, or (2) filing notice of appeal with the clerk of superior court and serving copies thereof upon all adverse parties within fourteen days after entry of the judgment[.]" N.C. R. App. P. 4(a) (2018). In the present case, defense counsel prematurely entered an oral notice of appeal before entry of the final judgment, in violation of Rule 4. Therefore, "[w]hile this Court cannot hear [D]efendant's direct appeal, it does have the discretion to consider the matter by granting a petition for writ of
 
 certiorari
 
 ."
 
 State v. McCoy
 
 ,
 
 171 N.C. App. 636
 
 , 638,
 
 615 S.E.2d 319
 
 , 320 (2005). In our discretion, we allow Defendant's first petition for writ of
 
 certiorari
 
 in order to reach the merits of his appeal.
 

 At the sentencing hearing, upon finding that Defendant had committed an aggravated offense, the trial court ordered Defendant to enroll in SBM. Defense counsel gave oral notice of appeal, but did not file written notice of appeal. Defendant also filed a second petition for writ of
 
 certiorari
 
 from the SBM order on 11 May 2018.
 

 A defendant must file a written notice of appeal from an SBM order pursuant to Rule 3 of the Rules of Appellate Procedure because of the civil nature of SBM proceedings. N.C. R. App. P. 3 (2018);
 
 State v. Brooks
 
 ,
 
 204 N.C. App. 193
 
 , 194-95,
 
 693 S.E.2d 204
 
 , 206 (2010) ("In light of our decisions interpreting an SBM hearing as not being a criminal trial or proceeding for purposes
 
 *504
 
 of appeal, we must hold that oral notice
 
 *504
 
 pursuant to N.C.R. App. P. 4(a)(1) is insufficient to confer jurisdiction on this Court. Instead, a defendant must give notice of appeal pursuant to N.C.R. App. P. 3(a) as is proper 'in a civil action or special proceeding.' "). Rule 3 provides that a party must enter notice of appeal from a civil action
 

 (a) by filing notice of appeal with the clerk of superior court and serving copies thereof upon all other parties ...
 

 ....
 

 (c) ....
 

 (1) within thirty days after entry of judgment if the party has been served with a copy of the judgment within the three-day period prescribed by Rule 58 of the Rules of Civil Procedure ; or
 

 (2) within thirty days after service upon the party of a copy of the judgment if service was not made within that three-day period[.]
 

 N.C. R. App. P. 3(a), (c). In the present case, Defendant did not file a written notice of appeal in compliance with Rule 3. However, in our discretion, we allow Defendant's second petition for writ of
 
 certiorari
 
 .
 

 III.
 
 Analysis
 

 A.
 
 Insufficiency of the Evidence
 

 Defendant argues that the trial court erred in denying his motion to dismiss for insufficiency of the evidence. Specifically, Defendant argues there was insufficient evidence showing that Miranda was "physically helpless" during sexual intercourse. We disagree.
 

 A motion to dismiss for insufficiency of the evidence is reviewed
 
 de novo
 
 .
 
 State v. English
 
 ,
 
 241 N.C. App. 98
 
 , 104,
 
 772 S.E.2d 740
 
 , 744 (2015). " 'Upon [a] defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' "
 
 State v. Fritsch
 
 ,
 
 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000) (quoting
 
 State v. Powell
 
 ,
 
 299 N.C. 95
 
 , 98,
 
 261 S.E.2d 114
 
 , 117 (1980) ).
 

 A person is guilty of second-degree forcible rape if the person engages in vaginal intercourse with another person:
 

 (1) By force and against the will of the other person; or
 
 *505
 
 (2) Who has a mental disability or who is mentally incapacitated or physically helpless, and the person performing the act knows or should reasonably know the other person has a mental disability or is mentally incapacitated or physically helpless.
 

 N.C. Gen. Stat. § 14-27.22
 
 (a) (2017).
 
 [2]
 
 "Physically helpless" is defined as either "[a] victim who is unconscious" or "[a] victim who is physically unable to resist an act of vaginal intercourse or a sexual act or communicate unwillingness to submit to an act of vaginal intercourse or a sexual act."
 
 N.C. Gen. Stat. § 14-27.20
 
 (3) (2017).
 

 Defendant argues Miranda's lack of memory is not affirmative evidence that she was unconscious, physically unable to resist intercourse or a sexual act, or unable to communicate unwillingness to intercourse or a sexual act. Defendant contends there was insufficient evidence that Miranda was physically helpless because the
 
 only
 
 evidence presented regarding consent was Defendant's statement to police and his testimony that Miranda consented to intercourse on two separate occasions, and that the State presented no evidence that Miranda did not consent.
 

 The State presented evidence that Miranda consumed sizable portions of alcohol over an extended period of time, was physically ill in the parking lot of the club, and was unable to remember anything after leaving the club. When Miranda returned to Defendant's apartment, she stumbled up the stairs and had to hold on to the stair rail. Miranda woke up the following morning with her skirt pulled up to her waist, her shirt off, and her underwear on the bed. Miranda's vagina was sore, and she had a blurry memory of pushing someone off her. Miranda
 
 *505
 
 never had a prior sexual relationship with Defendant. Moreover, Defendant's actions following the incident - his adamant initial denial that anything of a sexual nature occurred and subsequent contradictory admissions - tend to indicate Defendant knew of his wrongdoings,
 
 i.e.
 
 , Miranda was physically helpless at the time of the rape. Viewed in the light most favorable to the State, and drawing all reasonable inferences in favor of the State, there was sufficient evidence presented that Miranda was physically unable to resist intercourse or to communicate her unwillingness to submit to intercourse. Thus, Defendant's motion to dismiss was properly denied.
 
 *506
 
 B.
 
 Expert Testimony
 

 Defendant argues that, in refusing to allow the testimony of his proposed expert who would have testified as to an intoxicated person's ability to engage in volitional activities and not have any memory after the fact, the trial court abused its discretion, which amounted to prejudicial error. We disagree.
 

 "We review a trial court's admission of expert testimony for abuse of discretion."
 
 State v. Babich
 
 , --- N.C. App. ----, ----,
 
 797 S.E.2d 359
 
 , 361 (2017). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision."
 
 State v. Riddick
 
 ,
 
 315 N.C. 749
 
 , 756,
 
 340 S.E.2d 55
 
 , 59 (1986).
 

 North Carolina Rule of Evidence 702 controls the admissibility of expert testimony and states:
 

 (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C. Gen. Stat. § 8C-1, Rule 702(a) (2017).
 

 "Even when an abuse of discretion occurs, a defendant is not entitled to a new trial unless the error was prejudicial."
 
 State v. Mendoza
 
 , --- N.C. App. ----, ----,
 
 794 S.E.2d 828
 
 , 834 (2016). The erroneous exclusion of expert testimony is prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2017). Defendant bears the burden of demonstrating prejudice. N.C.G.S. § 15A-1443(a).
 

 At trial, defense counsel attempted to tender Dr. Wilkie Wilson ("Dr. Wilson"), a neuropharmacologist, as an expert witness. During
 
 voir dire
 
 ,
 
 *507
 
 Dr. Wilson testified that one of his areas of expertise was alcohol and its effect on memory. Dr. Wilson explained that he would testify "about what's possible and what's, in fact, very, very likely and [sic] when one drinks a lot of alcohol." Dr. Wilson proffered his opinion "that someone who is having a blackout might not be physically helpless." The State objected to Dr. Wilson's testimony, arguing that Dr. Wilson's inability to demonstrate more than "maybe" possibilities meant his testimony would not be helpful to the jury. The trial court then sustained the State's objection, explaining that "this doctor will not assist the trier of fact to understand the evidence or to determine a fact in issue in this case[.]"
 

 The State did not present evidence of Miranda's lack of memory as affirmative evidence that she was physically helpless at the time of the sexual encounter. Dr. Wilson's testimony was to the effect that an intoxicated person can engage in volitional activities and not remember. Because the State's theory of physical helplessness did not rest on Miranda's lack of memory, Dr. Wilson's testimony would not have helped the jury "determine a fact in issue in this case." Indeed, the State presented evidence that Miranda engaged in volitional activities when she was intoxicated, such as walking up the stairs to Defendant's apartment, although Miranda
 
 *506
 
 had no memory of that action. Therefore, the trial court did not abuse its discretion in excluding Dr. Wilson's testimony.
 

 Even assuming,
 
 arguendo
 
 , that the trial court erred in excluding Dr. Wilson's testimony because it was not in the common knowledge of the jurors, this error did not prejudice Defendant. The State presented evidence of physical helplessness in the form of testimony regarding Miranda's consumption of large amounts of alcohol prior to, and after, arriving at the club; her blurry memory of pushing someone off her; and Defendant's deception and lies after the encounter. Therefore, the State presented overwhelming evidence of Miranda's physical helplessness, and Defendant has not met his burden of showing that there was "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" N.C.G.S. § 15A-1443(a).
 

 C.
 
 Jury Instruction
 

 Defendant argues the trial court committed plain error in failing to instruct the jury that lack of consent was an element of rape of a physically helpless person. We disagree.
 

 The trial court instructed the jury in accordance with the pattern jury instructions for rape of a physically helpless person, N.C.P.I.-Crim. 207.25. The trial court instructed the jury that
 

 *508
 
 the State must prove three things beyond a reasonable doubt: First, that the defendant engaged in vaginal intercourse with the victim. Vaginal intercourse is penetration, however slight, of the female sex organ by the male sex organ. The actual emission of semen is not necessary. Second, that the victim was physically helpless. A person is physically helpless if the person is unconscious, physically unable to resist an act of vaginal intercourse, physically unable to communicate unwillingness to submit to an act of vaginal intercourse, or physically unable to resist a sexual act. And, third, that the defendant knew or should reasonably have known that the victim was physically helpless. If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant engaged in vaginal intercourse with the victim and at that time the victim was so physically unable to resist an act of vaginal intercourse, to communicate unwillingness to submit to an act of vaginal intercourse, or resist a sexual act as to be physically helpless, and that the defendant knew or should reasonably have known that the victim was physically helpless, it would be your duty to return a verdict of guilty. If you do not so find or have a reasonable doubt about one or more of these things, it would be your duty to return a verdict of not guilty.
 

 Defense counsel did not object to the jury instructions at trial or at the charge conference. It is well established that, when no objection is made to jury instructions, this Court's review is limited to the plain error standard.
 

 "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected."
 
 State v. Holden
 
 ,
 
 346 N.C. 404
 
 , 435,
 
 488 S.E.2d 514
 
 , 531 (1997). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."
 
 State v. Odom
 
 ,
 
 307 N.C. 655
 
 , 661,
 
 300 S.E.2d 375
 
 , 378 (1983) (internal quotation marks and brackets omitted). "In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt."
 
 Id.
 
 at 661,
 
 300 S.E.2d at 378-79
 
 . "A prerequisite to our engaging in a 'plain error' analysis is the determination that the
 
 *509
 
 instruction complained of constitutes 'error' at all."
 
 State v. Johnson
 
 ,
 
 320 N.C. 746
 
 , 750,
 
 360 S.E.2d 676
 
 , 679 (1987).
 

 The Supreme Court of North Carolina held:
 

 In the case of a sleeping, or similarly incapacitated victim, it makes no difference whether the indictment alleges that the vaginal intercourse was by force and
 
 *507
 
 against the victim's will or whether it alleges merely the vaginal intercourse with an incapacitated victim. In such a case sexual intercourse with the victim is
 
 ipso facto
 
 rape because the force and lack of consent are implied in law.
 

 State v. Moorman
 
 ,
 
 320 N.C. 387
 
 , 392,
 
 358 S.E.2d 502
 
 , 506 (1987) ;
 
 see also
 

 State v. Atkins
 
 ,
 
 193 N.C. App. 200
 
 , 204,
 
 666 S.E.2d 809
 
 , 812 (2008) (citing
 
 Moorman
 
 and explaining that the second theory of second-degree rape "is applicable when the victim falls within a special class of victims, who are deemed by law incapable of resisting or withholding consent; thus, force and the absence of consent need not be proved by the State, as they are implied in law").
 

 Defendant acknowledges that the pattern jury instruction follows the text of the statute.
 
 See
 

 Caudill v. Smith
 
 ,
 
 117 N.C. App. 64
 
 , 70,
 
 450 S.E.2d 8
 
 , 13 (1994) ("This Court has recognized that the preferred method of jury instruction is the use of the approved guidelines of the North Carolina Pattern Jury Instructions."). However, Defendant argues the jury should have been instructed that lack of consent is an element of rape of a physically helpless person. Defendant's argument is predicated on our Supreme Court's holding in
 
 State v. Holden
 
 ,
 
 338 N.C. 394
 
 ,
 
 450 S.E.2d 878
 
 (1994).
 

 In
 
 Holden
 
 , our Supreme Court determined that the submission of a judgment at a sentencing hearing, entered upon a defendant's prior conviction of attempted second-degree rape, was sufficient for the State to prove, as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(3) (1988), that the defendant had committed a prior felony involving the use or threat of violence to the person.
 
 338 N.C. at 403-07
 
 , 450 S.E.2d at 883-85. The defendant in
 
 Holden
 
 - unlike Defendant in the present case - did not argue on appeal that the trial court should have instructed the jury that lack of consent was an element of second-degree rape. Instead, the defendant argued the judgment entered upon his prior conviction for attempted second-degree rape did not establish, on its own, that the prior felony was accompanied by the use or threat of violence.
 
 Id.
 
 at 404, 450 S.E.2d at 883. Thus, under the defendant's reasoning, because second-degree rape can involve a person who is mentally defective,
 
 *510
 
 mentally incapacitated, or physically helpless, violence or the threat of violence is not necessarily required.
 
 Id.
 
 at 404, 450 S.E.2d at 883.
 

 Our Supreme Court disagreed with the defendant's contention, and "reject[ed] the notion of any felony which may properly be deemed 'non-violent rape.' "
 
 Id.
 
 at 405, 450 S.E.2d at 884. The Court held that "[t]he acts of having or attempting to have sexual intercourse with another person who is mentally defective or incapacitated and statutorily deemed incapable of consenting - just as with a person who refuses to consent - involve the 'use or threat of violence to the person[,]' " noting that it did not "believe that having or attempting to have sexual intercourse with a 'physically helpless' person in violation of N.C.G.S. § 14-27.3(a)(2) may properly be deemed 'non-violent' rape or attempted rape."
 
 Id.
 
 at 406, 450 S.E.2d at 884.
 

 In the present case, the trial court properly instructed the jury on all of the elements of second-degree rape of a physically helpless person. Since "the force and lack of consent are implied in law,"
 
 Moorman
 
 , 320 N.C. at 392,
 
 358 S.E.2d at 506
 
 , the trial court was not required to instruct the jury that lack of consent was an essential element of second-degree rape.
 
 See
 

 State v. Compton
 
 ,
 
 244 N.C. App. 153
 
 ,
 
 780 S.E.2d 760
 
 , No. 15-567,
 
 2015 WL 7288456
 
 (2015) (unpublished) ("The trial court properly instructed the jury on the elements of second-degree rape of a physically helpless person because the force and lack of consent are implied in law." (internal quotation marks and citation omitted)). Accordingly, we hold Defendant has failed to demonstrate error, let alone plain error, in the trial court's instructions to the jury.
 

 D.
 
 Cumulative Error
 

 Defendant argues that, because the trial court erred by denying Defendant's motion to dismiss, excluded Dr. Wilson's testimony, and failed to instruct the jury on an element of the crime, the trial court committed cumulative error, warranting a new trial. "Cumulative errors lead to reversal when taken as a whole they deprived the defendant of his due process right to a fair trial free from prejudicial
 
 *508
 
 error."
 
 State v. Wilkerson
 
 ,
 
 363 N.C. 382
 
 , 426,
 
 683 S.E.2d 174
 
 , 201 (2009) (internal quotation marks and brackets omitted). Since we hold that Defendant has failed to show prejudicial error at trial, we necessarily find no cumulative error.
 

 E.
 
 SBM
 

 Defendant argues the trial court erred in ordering lifetime SBM for Defendant because the State did not meet its burden of proving that it was a reasonable Fourth Amendment search. We agree.
 

 *511
 
 Our General Assembly has enacted "a sex offender monitoring program that uses a continuous satellite-based monitoring system ... designed to monitor" the location of individuals convicted of certain sex offenses after they are released from prison."
 
 N.C. Gen. Stat. § 14-208.40
 
 (a) (2017). The United States Supreme Court held in
 
 Grady v. North Carolina
 
 , 575 U.S. ----,
 
 135 S.Ct. 1368
 
 ,
 
 191 L.Ed.2d 459
 
 (2015) that SBM is a "search" under the Fourth Amendment. 575 U.S. at ----,
 
 135 S.Ct. at 1370-71
 
 ,
 
 191 L.Ed.2d at 461-62
 
 . Therefore, before subjecting a defendant to enrollment in SBM, North Carolina Courts must first "examine whether the State's monitoring program is reasonable - when properly viewed as a search."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1371
 
 ,
 
 191 L.Ed.2d at 463
 
 . "This reasonableness inquiry requires the court to analyze the 'totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.' "
 
 State v. Greene
 
 , --- N.C. App. ----, ----,
 
 806 S.E.2d 343
 
 , 344 (2017) (quoting
 
 Grady
 
 , 575 U.S. at ----,
 
 135 S.Ct. at 1371
 
 ,
 
 191 L.Ed.2d at
 
 462 ).
 

 1. Preservation of the Issue
 

 We must first address whether this issue was preserved for appellate review. At the sentencing hearing, the State asked the trial court to
 

 have the hearing, to have the [c]ourt find under the totality of the circumstances, balancing those interests of both the intrusion into his privacy versus a compelling State interest, that it is not unreasonable and the search is not unreasonable under these circumstances. You've heard the evidence in the case. I would also submit to you, one, there have been many cases that come down and talk about the fact that the United States -- you know, the United States Supreme Court has recognized the dangers of recidivism in cases of sex offenders and that when sex offenders reenter society they are much more likely than any other type of offender to be arrested for a new rape or sexual assault. Especially concerning to the State is the fact that, from what everything I could see in this case, ... I still don't think he gets it. I really don't. And so that makes me concerned that the level of ability to re-offend and recidivate is much higher. And so I would ask that you do that balancing test and that under the circumstances find that it is not an unreasonable search and order lifetime satellite based monitoring as well.
 

 Defendant failed to object. After hearing the State's argument, the trial court announced from the bench:
 

 *512
 
 [T]he Court further finds that -- based on the evidence that has been submitted in this case and the [c]ourt taking into consideration the totality of the circumstances, the [c]ourt at this time finds that it is appropriate and necessary that upon release from imprisonment that this defendant shall enroll in a satellite based monitoring program for his natural life until such time that the monitoring is terminated pursuant to the North Carolina General Statutes.
 

 The trial court then specifically asked the parties if either wanted to add anything to the discussion, and both parties declined.
 

 The State contends that Defendant failed to preserve the issue of whether the imposition of SBM on Defendant was reasonable under the Fourth Amendment because he did not object or raise this issue at trial. Defendant argues that, because SBM was imposed at the sentencing hearing, the issue was automatically preserved pursuant to
 
 State v. Dye
 
 , --- N.C. App. ----,
 
 802 S.E.2d 737
 
 (2017). We reject Defendant's argument because the procedural posture of
 
 Dye
 
 is inapposite to the present case.
 

 *509
 
 In
 
 Dye
 
 , the defendant was convicted of statutory rape and sentenced to a term of imprisonment and SBM for a thirty-year period.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 739
 
 . The defendant was sentenced under a statute that required the trial court to determine whether the defendant fit into a statutorily designated category.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 742
 
 . The statute mandated that, if the trial court determined the defendant did not fit into a statutorily designated category, the Division of Adult Correction was required to conduct a risk assessment.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 742
 
 . The trial court was then able to consider the risk assessment before making a determination as to whether the defendant required the highest possible level of supervision and monitoring.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 742
 
 .
 

 The trial court determined the defendant did not fit into a statutorily designated category and, therefore, ordered that the Division of Adult Correction conduct a risk assessment.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 743
 
 . The risk assessment conducted on the defendant indicated that he was in the "Moderate-High" risk category.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 743
 
 . Based on the assessment, the trial court found that the defendant required the highest level of monitoring and supervision, and imposed SBM.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 743
 
 . The defendant did not object.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 741-42
 
 .
 

 *513
 
 On appeal, the defendant argued the trial court erred by ordering SBM without making sufficient findings of fact that the defendant required the highest level of monitoring.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 741
 
 . The defendant contended the matter was automatically preserved pursuant to N.C. Gen. Stat. § 15A-1446(d)(18) (2017)
 
 [3]
 
 (providing grounds under which errors are preserved without objection, including if "[t]he sentence imposed was unauthorized at the time imposed, exceeded the maximum authorized by law, was illegally imposed, or is otherwise invalid as a matter of law"). The State argued that the defendant failed to preserve the issue because he did not object at the SBM hearing.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 741-42
 
 .
 

 In its decision, this Court cited prior decisions that held that a " 'Moderate-High' risk category was insufficient to support a finding that the highest possible level of supervision and monitoring was required."
 

 Id.
 

 at ----,
 
 802 S.E.2d at 743
 
 . This Court held the trial court erred in finding that the defendant required the highest level of supervision and monitoring based solely on the risk assessment, and vacated the order imposing SBM on the defendant.
 

 Id.
 

 at ----,
 
 802 S.E.2d at 743-44
 
 .
 

 In
 
 Dye
 
 , the SBM order was clearly erroneous, as the trial court's finding was in direct conflict with precedent of this Court. In contrast, in the present case, Defendant argues the trial court erred in imposing SBM because the State did not prove that Defendant's enrollment in SBM was a reasonable Fourth Amendment search. This Court has never found that the issue of reasonableness within the context of SBM hearings was within the purview of N.C.G.S. § 15A-1446(d)(18). Thus, we reject Defendant's argument and hold that the matter was not automatically preserved by statute.
 

 Having determined the issue was not automatically preserved, we now address whether the matter was otherwise preserved. "Our appellate courts will only review constitutional questions raised and passed upon at trial."
 
 State v. Mills
 
 ,
 
 232 N.C. App. 460
 
 , 466,
 
 754 S.E.2d 674
 
 , 678 (2014).
 

 We acknowledge that this is a tumultuous time in our case law regarding the parties' burdens and the role of the trial court in hearings on SBM ("
 
 Grady
 
 hearings"). A review of recent case law reveals three
 
 *514
 
 broad scenarios in which this Court addressed preservation issues in the context of
 
 Grady
 
 hearings. In the first scenario, a defendant fails to object to the imposition of SBM, the State offers no statements regarding reasonableness, and the trial court does not pass on the issue.
 
 See
 

 State v. Lindsey
 
 , --- N.C. App. ----,
 
 818 S.E.2d 344
 
 (2018) (holding the
 
 *510
 

 Grady
 
 issue was not preserved for appellate review when it was not raised at trial by either party and not ruled upon by the trial court, and declining to invoke Rule 2 because the law regarding preservation of it in the context of
 
 Grady
 
 hearings was settled);
 
 see also
 

 State v. Bishop
 
 , --- N.C. App. ----,
 
 805 S.E.2d 367
 
 (2017). In the second scenario, a defendant objects to a trial court's imposition of SBM, but does not specify that the objection is grounded in Fourth Amendment or
 
 Grady
 
 .
 
 See
 

 State v. Bursell
 
 , --- N.C. App. ----,
 
 813 S.E.2d 463
 
 (2018) (holding the issue of
 
 Grady
 
 was preserved at trial when it was apparent from the context that the defendant's objection implicated the defendant's right to a reasonableness determination). In the third scenario, the State specifically argues that the imposition of SBM on a defendant is a reasonable Fourth Amendment search, the defendant does not object to the imposition of SBM, and the trial court passes on the issue.
 
 See
 

 State v. Griffin
 
 , --- N.C. App. ----,
 
 818 S.E.2d 336
 
 (2018) (holding the
 
 Grady
 
 issue was preserved when it was raised at trial and passed upon by the trial court);
 
 see also
 

 State v. Hammonds
 
 , No. COA17-931,
 
 2018 WL 1386738
 
 (N.C. Ct. App. Mar. 20, 2018) (unpublished).
 

 In essence, our Courts have distinguished between cases in which (1) the trial court failed to conduct a reasonableness inquiry, and (2) the State initiated a reasonableness inquiry, and the trial court passed on the matter. In the former, a defendant must object to preserve the issue because "[a]lthough the State has the burden of proof of reasonableness of SBM under the Fourth Amendment as directed by
 
 Grady
 
 , the defendant still must raise the constitutional objection so the State will be on notice it must present evidence to meet its burden."
 
 Lindsey
 
 , --- N.C. App. at ----, 818 S.E.2d at 349 (internal citation omitted);
 
 see also
 

 State v. Stroessenreuther
 
 , --- N.C. App. ----, ----,
 
 793 S.E.2d 734
 
 , 735 (2016) ("Under
 
 Grady
 
 , the trial court was required to consider the reasonableness of the satellite-based monitoring when [the defendant] challenged that monitoring on Fourth Amendment grounds."). In the latter, the State initiates the
 
 Grady
 
 discussion and, thus, has the opportunity to satisfy its burden of proving a search is reasonable under the Fourth Amendment, and the trial court has the opportunity to rule on it. Therefore, an objection is not necessary to preserve the
 
 Grady
 
 issue for appellate review.
 

 *515
 
 In the present case, the State initiated the
 
 Grady
 
 discussion and argued imposition of SBM on Defendant was a reasonable Fourth Amendment search. Although Defendant did not object at trial, the reasonableness of SBM of Defendant was raised and passed upon by the trial court. In
 
 State v. Hammonds
 
 , an unpublished opinion with facts similar to the present case, the State initiated a
 
 Grady
 
 discussion, and the trial court found SBM of the defendant was a reasonable search.
 
 2018 WL 1386738
 
 , at *1. The defendant failed to object.
 
 Id.
 
 at *2. This Court held that "[t]he dialogue quoted above reflects that the issue of whether SBM constituted a reasonable search pursuant to
 
 Grady
 
 was raised by the State during the hearing and passed on by the trial court. The State cannot now argue that the issue was waived."
 
 Id.
 
 at *2. Here, as in
 
 Hammonds
 
 , it is evident the State recognized that a
 
 Grady
 
 hearing was necessary, and the trial court understood it needed to conduct a balancing test. Therefore, although Defendant did not object at trial, we hold the
 
 Grady
 
 issue was preserved for appellate review.
 

 2. Reasonableness Inquiry
 

 We now address whether the trial court properly determined that SBM was a reasonable Fourth Amendment search of Defendant. "The State bears the burden of proving that enrollment in satellite-based monitoring is a permissible Fourth Amendment search of each particular defendant targeted."
 
 State v. White
 
 , --- N.C. App. ----, ----,
 
 820 S.E.2d 116
 
 , 121 (2018).
 

 In the present case, the State initiated the discussion about reasonableness and the Fourth Amendment. The State asked the trial court to balance the invasion of privacy against the State's compelling interest, and to find that the imposition of SBM on Defendant was not an unreasonable search. The State requested that the trial court consider the evidence of the case and that: (1) "the United States Supreme Court has recognized
 
 *511
 
 the dangers of recidivism in cases of sex offenders and that when sex offenders reenter society they are much more likely than any other type of offender to be arrested for a new rape or sexual assault;" and (2) based on the State's observation, Defendant does not "get[ it," which makes the State "concerned that the level of ability to re-offend and recidivate is much higher." The trial court announced from the bench that, after considering the totality of the circumstances, Defendant's enrollment in SBM was "appropriate and necessary."
 

 It is apparent from the transcript that the State had both the knowledge of its burden and the opportunity to put on sufficient evidence to satisfy its burden.
 
 Cf.
 

 Id.
 

 at ----,
 
 820 S.E.2d at 122
 
 (vacating and
 
 *516
 
 remanding an SBM order when "[t]he trial court did not afford the State an opportunity to present evidence in order to establish the constitutionality of enrolling [the d]efendant in satellite-based monitoring"). In the present case, the State failed to carry its burden of proving SBM of Defendant was a reasonable Fourth Amendment search because it did not put on any evidence regarding reasonableness.
 
 See
 

 Greene
 
 , --- N.C. App. at ----,
 
 806 S.E.2d at 345-46
 
 (reversing the trial court's order because "the nature of the State's burden was no longer uncertain at the time of defendant's satellite-based monitoring hearing. [Previous cases from this Court] made clear that a case for satellite-based monitoring is the State's to make"). Therefore, because "the State will have only one opportunity to prove that SBM is a reasonable search of the defendant[,]" and, in the present case, the State was previously afforded such an opportunity and failed to prove that SBM is a reasonable search of Defendant, we reverse the trial court's SBM order.
 
 State v. Grady
 
 , --- N.C. App. ----, ----,
 
 817 S.E.2d 18
 
 , 28 (2018)
 

 F.
 
 Ineffective Assistance of Counsel
 

 Defendant argues that, in the event this Court does not reach the merits of the SBM issue, Defendant received ineffective assistance of counsel. However, because we have reached the merits of the above issue, we need not address this alternative argument.
 

 IV. Conclusion
 

 For the reasons stated above, this Court holds that the trial court did not err in denying Defendant's motion to dismiss and in instructing the jury in accord with the pattern jury instructions for second-degree rape. We also hold that the trial court did not commit prejudicial error in excluding the testimony of Dr. Wilson. Finally, we hold that the trial court erred in imposing SBM on Defendant, and we reverse the SBM order.
 

 NO ERROR IN PART; NO PREJUDICIAL ERROR IN PART; REVERSED IN PART.
 

 Judges HUNTER, JR. and HAMPSON concur.
 

 [1]
 

 We adopt the pseudonym "Miranda" used in the briefs to protect the identity of Miranda.
 

 [2]
 

 Defendant was charged under
 
 N.C. Gen. Stat. § 14-27.3
 
 (a) (2013). The statute has since been recodified at N.C.G.S. § 14-27.22. 2015 N.C. Sess. Law ch. 181, § 4(a).
 

 [3]
 

 Although our Supreme Court "has held several subdivisions of subsection 15A-1446(d) to be unconstitutional encroachments on the rulemaking authority of the Court, subdivision (18) is not one of them."
 
 State v. Meadows
 
 , --- N.C. ----, ----,
 
 821 S.E.2d 402
 
 , 406 (2018) (footnote omitted).