An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-175

Filed 17 December 2025

Beaufort County, No. 21CR050054-060

STATE OF NORTH CAROLINA

v.

WILLIAM CHARLES WATERS

Appeal by defendant from judgment entered 20 October 2023 by Judge Joshua W. Willey Jr. in Beaufort County Superior Court. Heard in the Court of Appeals 29 October 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Zachary K. Dunn, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Zimmer, for defendant.*

ARROWOOD, Judge.

William Charles Waters ("defendant") appeals from judgment entered after jury trial, where he was found guilty of second-degree murder. Defendant argues that the court erred by including misleading language in its instructions on the aggressor doctrine, and by denying defendant's requests for instructions on several

affirmative defenses, claiming that these alleged cumulative errors denied him a fair trial. For the following reasons, we disagree, find no error, and affirm the trial court's judgment.

## I. Background

### A. The Events of 11 January 2021

Defendant shot and killed Jamie "Bumper" Daniels on 11 January 2021 at Slatestone Grocery on Slatestone Road in Washington, North Carolina. On the day of the killing, Mr. Daniels was an itinerant commercial fisherman who was temporarily staying at defendant's home on Terrapin Track Road, a short walk around the corner from the store. Defendant was generally aware of Mr. Daniels' criminal record, including convictions on drug charges.

Defendant kept firearms at home, and he testified that, on the night before the killing, he noticed that his Smith & Wesson M&P Shield was missing. He confronted three friends, all of whom were present at his home at the time: Antwone Parker, Evan Landing, and Mr. Daniels. He said that he would "turn the house upside down" and would file a police report to recover the firearm. Defendant testified that, while Mr. Parker and Mr. Daniels were outside, he searched Mr. Daniels' bags and discovered one of the two magazines he kept for his Shield. Instead of contacting police, defendant armed himself with his other firearm, a Sig Sauer P320, and went outside to confront Mr. Daniels, who he testified was having an argument with Mr. Parker. Defendant claimed that Mr. Daniels was "reaching in his pockets, messing

around with his waistband," but defendant did not see Mr. Daniels with the firearm itself, nor did he ask him whether he had it. Defendant testified that he drew and raised the Sig Sauer P320 and told Mr. Daniels to "get his hands away from his waistband." Mr. Daniels then ran across the front yard into the street. Both Mr. Landing and defendant followed Mr. Daniels on foot. David Willoughby, a neighbor on Terrapin Track Road, saw Mr. Daniels run away, and testified that he heard him yelling, "Y'all some crazy sons of bitches," and Mr. Landing and defendant telling Mr. Daniels to stop.

In addition to testimony from several neighbors living between defendant's home and the grocery, the State introduced into evidence footage taken on neighbors' home security cameras. The video evidence, taken as a whole, tended to show defendant following Mr. Daniels across neighboring properties to Everett Lane, which runs parallel to Terrapin Track Road and leads to the Slatestone Grocery parking lot at its intersection with Slatestone Road. The men continued northwest on Everett Lane past several homes, ultimately entering the parking lot. Mary Chacon, a neighbor on Everett Lane, testified that she heard a man yelling for help. Her husband, Dave Chacon, testified that he heard a man say, "Somebody's trying to kill me" and saw several men crossing his property and walking towards the grocery store.

Jo Worsley Sermons, who was working on Everett Lane, testified that she heard yelling and opened her door to see two men: the first, "an older man with a

weathered face" who "looked scared" and "like he was trying to get away" and a second "taller" man wearing a "blue coat." Ms. Sermons testified that she "clearly saw" the second man "pointing a gun . . . to the back of . . . the weathered old man." She testified that she shouted that she would call the police, and that the second man responded, "go ahead." The State introduced audio of Ms. Sermons' 911 call, in which one can hear her report, "there's a guy chasing a guy down the street with a gun" before the sound of gunshots.

The only home security video containing sound was captured at 2076 Slatestone Road, directly across Everett Lane from the entrance to the Slatestone Grocery parking lot. In the video, one can see Mr. Daniels walking on Everett Lane and turning to look behind him. One can then hear a man's voice saying, "Leave me alone." Defendant then enters the frame with an arm raised in Mr. Daniels' direction. A second man's voice says, "Stop." The first man's voice then says, "Quit pointing that gun at me," followed by an inaudible phrase. The second man repeats, "Stop right now." After the men leave the frame, the video captures further audible yelling between the men.

The State introduced into evidence three lengthy videos from Slatestone Grocery's security cameras. The first, taken from the rear of the store, captures Mr. Daniels running onto Everett Lane from the direction of defendant's house, followed by defendant and then Mr. Landing. The men are seen moving towards the parking lot entrance at the intersection of Everett Lane and Slatestone Road.

The latter two videos, which did not include audio, were recorded from the front and side of Slatestone Grocery and depict a complex tussle between defendant and Mr. Daniels as it plays out in the parking lot. The two videos show the following series of events.

Mr. Daniels entered the parking lot followed by defendant, who can be seen with his arm raised towards him. Defendant then put his weapon in its holster and the two men tussled while Mr. Landing entered the lot. Defendant, facing the camera, used his arms to pin Mr. Daniels against the rear of a white pick-up truck, and defendant and Mr. Landing shouted something at grocery patrons watching nearby. Mr. Daniels broke loose and ran around the far side of a second white pick-up truck, followed by defendant. The two men continued to tussle with their hands.

Defendant testified that, at this point, Mr. Daniels was holding his firearm in his right hand; the firearm can be seen in this hand from about 1:39:51-1:40:22. The driver of the second pick-up truck pulled out of the parking spot, and Mr. Parker drove his pick-up truck into the lot. Defendant backed Mr. Daniels across the vacant parking spot into the small space between a white fence and the front engine of the first pick-up truck. While backing up, Mr. Daniels was holding his right hand behind his buttocks. Mr. Daniels was facing away from the camera, towards the truck and defendant.

Mr. Daniels placed his left hand on the hood of the pick-up truck, and his right hand was not visible to the camera. Defendant raised his Sig Sauer P320 at 1:40:19.

Mr. Daniels was not pointing his gun and was not looking at defendant.  Defendant then shot several rounds into Mr. Daniels, who fell back against the fence.  The gun then dropped out of Mr. Daniels' right hand.  Police arrived at the scene about two minutes later and defendant promptly surrendered.

Gunshot residue was found on Mr. Daniels' hands.  Officers found a leather holster, a powder substance, a leafy green substance, and defendant's Alprazolam prescription on Mr. Daniels' person.  The State introduced testimony from Dr. Randall Falls ("Dr. Falls") from the Greenville Medical Examiner's Office, who performed an autopsy on Mr. Daniels, and whose report stated that Daniels sustained fourteen gunshot wounds which caused his death.  The State introduced the Laboratory Report Summaries of the N.C. State Crime Laboratory, photographs of the victim's injuries and the scene, the two firearms, and the recovered bullets, magazine, and spent 9-mm casings.

At the charge conference, defendant requested jury instructions on self-help and detention of an offender by a private person.  These instructions were denied, but the jury was instructed on self-defense and the aggressor doctrine.  The jury deliberated for over five hours, asking to review defendant's testimony and, in slow-motion, the video footage, before finding defendant guilty of second-degree murder.  Defendant initially received a sentence of between 330 and 408 months imprisonment.

### B.     Defendant's Motions for Appropriate Relief

Consistent with standard procedure, the investigation in this case included an autopsy of Mr. Daniels' body, but a full toxicology report was not prepared at that time. According to an incident report included with defendant's second MAR, on 13 September 2023, a few weeks before the first day of defendant's trial, Lieutenant Brad Shackelford ("Lt. Shackelford") received the autopsy report, which "did not list additional drugs or whether or not additional testing was performed." At this time, Chief ADA Thomas Anglin asked Lt. Shackelford to arrange additional testing on blood retained from Mr. Daniels' body. Lt. Shackelford inquired "whether any prescription or elicit [sic] drugs [were] tested for in this case" and "If not . . . are these sample still available if further testing is requested?" In response, Dr. Falls explained that when a cause of death is clear, as it was in this case, no toxicology testing is performed save an ethanol test, and that any blood was likely discarded but could still be stored in Raleigh. Lt. Shackelford contacted the appropriate Raleigh office, found that the samples were still available, and made a request for additional testing with that office. However, the DA's office and Lt. Shackelford did not receive the full toxicology report until 24 October 2023, after defendant's trial concluded.

At trial, the State introduced testimony from both Dr. Falls and Deputy Kevin Sitterson ("Deputy Sitterson"), the lead investigator in the case. Deputy Sitterson testified on cross examination that he did not know whether the DA's office had made any requests for tests above and beyond the standard procedure. Dr. Falls testified that he drew blood at the State's request, and that the State had not asked him that

it be tested for controlled substances.

Ten days after the conviction, defendant moved for appropriate relief, arguing that he was entitled to a new trial or a new sentencing hearing, because in the preceding days his counsel had received a toxicology report for Mr. Daniels, which noted that he died with "toxic and impairing levels of methamphetamine in his blood" along with benzoylecgonine and amphetamine. The trial court denied the portions of the MAR seeking a new trial and granted the portions seeking a new sentencing hearing, on other grounds. Defendant had claimed that the toxicology report was created after the trial and had been relevant to his self-defense claims. Defendant filed a second MAR with this Court on the same day as his Appellate Brief.

## II.    Discussion

Defendant argues that a new trial is required because the jury instructions excluded discussion of two affirmative defenses – claim of right and detention of an offender by a private person – and included language about the display of a firearm in its discussion of the aggressor doctrine. Defendant argues that the cumulative effect of these errors was sufficiently prejudicial to require reversal. Alternately, defendant moves for appropriate relief, arguing again that the toxicology report was created after trial and relevant to his self-defense claims, and also that the State allowed two of its witnesses to give false testimony about toxicology testing without correcting the record, in violation of his Due Process rights. For the following reasons, we find defendant's motion for appropriate relief to be without merit, find no error in

the trial court's jury instructions, and affirm the trial court's judgment.

### A.     Defendant's Requested Jury Instructions

Defendant argues that the trial court erred by denying two instructions: detention of an offender by a private person and claim of right. To determine whether a defendant was entitled to his requested jury instructions, this Court "reviews de novo whether each element of the defense is supported by substantial evidence when taken in the light most favorable to the defendant." *State v. Meader*, 377 N.C. 157, 162 (2021). A trial court must include a jury instruction if its substance is both "correct in itself" and "supported by the evidence." *State v. Hicks*, 385 N.C. 52, 60 (2023) (quoting *State v. Mercer*, 373 N.C. 459, 462 (2020)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin*, 327 N.C. 162, 171 (1990). The trial judge must consider only the sufficiency of the evidence, not its credibility; this is a question for the jury. *State v. Ataei-Kachuei*, 68 N.C. App. 209, 212 (1984).

### 1.     Detention of an Offender by a Private Person

This defense is available in limited circumstances. A person may detain another person "when he has probable cause to believe that the person detained has committed in his presence" either a felony, a breach of the peace, a crime involving physical injury to another person, or a crime involving theft or destruction of property. N.C.G.S. § 15A-404(b). "The detention must be in a reasonable manner considering the offense involved and the circumstances of the detention." N.C.G.S. §

15A-404(c). Therefore, defendant would have been entitled to the requested instruction if, when viewed in the light most favorable to him, there was substantial evidence that he had probable cause to believe Mr. Daniels committed one of the above crimes, that defendant was trying to detain him temporarily until he could be apprehended by police, and that the manner of the detention was reasonable under the circumstances. *Ataei-Kachuei*, 68 N.C. App. at 213. Probable cause is a "reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." *State v. Harris*, 279 N.C. 307, 311 (1971). The evidence "need not amount to proof of guilt, . . . but it must be such as would actuate a reasonable man acting in good faith." *Id*.

The evidence relevant to defendant's mental state when he allegedly attempted to detain Mr. Daniels was his own testimony that the firearm was missing, that he discovered one of its magazines in Daniels' bag, and that Daniels was "messing" with his waistband when defendant confronted him outside his house. Defendant testified that, before the confrontation, he had already concluded that Daniels had the gun or knew where it was. But rather than call the police, as he had warned Daniels he would, to handle the situation and determine whether Daniels did indeed have the gun, defendant admitted at trial that he confronted him and raised his SIG Sauer P320 without first seeking any further confirmation of his suspicion.

Assuming *arguendo* the truth of this testimony and viewing it in the light most

favorable to him, there was indeed some ground for reasonable suspicion that Mr. Daniels possessed the gun in defendant's presence. "[M]essing with [one's] waistband" is one factor which might, as one factor among others, support reasonable suspicion. *See State v. Sutton*, 232 N.C. App. 667, 669 (2014). But this ground was not supported by circumstances "sufficiently strong in themselves to warrant a cautious man in believing" that Daniels did, at that moment or thereafter, possess the gun either actually or constructively in defendant's presence. *Harris*, 279 N.C. at 311. Mr. Daniels was away from the property for several hours that morning and had only recently returned. Defendant also testified that several other people were in and around his home throughout the time the gun was unaccounted for. That the magazine was in Daniels' bag during that time also falls short of the kind of circumstances that we have recognized might thereby establish constructive possession of a firearm, as in *State v. Taylor*, where a suspect possessed ammunition "that smelled like they had 'just recently [been] fired'" accompanied by additional magazines and a nearby handgun. *State v. Taylor*, 203 N.C. App. 448, 459 (2010). That Daniels took off running also lends no support to defendant's claim of probable cause, because defendant began this confrontation by raising a gun at him. Accordingly, until Daniels actually displayed it seconds before the killing, defendant's arguably reasonable suspicion was not sufficiently supported by circumstances generating probable cause that Daniels possessed the firearm.

Furthermore, defendant's detention was not reasonable given the

circumstances. In this context, to "detain" means "[t]o hold or keep in or as if in custody." *State v. Wall*, 304 N.C. 609, 615–16 (1982) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976)). Without probable cause to believe Mr. Daniels had his gun and instead of contacting police to resolve the situation, he chose to chase Daniels, trespassing through several neighboring properties, aiming a loaded gun at him. When probable cause did arise, at about 1:39:50 p.m. in the Slatestone Grocery parking lot, defendant made no attempt whatsoever to "hold or keep" Daniels in a custodial fashion. He did not fire warning shots before he shot Daniels to death, even though, as several witnesses testified, numerous bystanders were already contacting police to respond. The decisions defendant made throughout these events were, under the circumstances, utterly unreasonable. Therefore, because the requested jury instruction was not justified given the evidence, the court correctly determined that defendant was not entitled to it. Accordingly, we find no error.

## 2.     Claim of Right

Defendant acknowledges in his brief that this defense is available for a defendant charged with armed robbery. Defendant cites the following statement of the law: "North Carolina acknowledges a 'claim of right' defense to the crime of armed robbery, which states that '[a] defendant is not guilty of robbery if he forcibly takes personal property from the actual possession of another under a bona fide claim of right or title to the property.'" *In re J.A.D.*, 283 N.C. App. 8, 15 (2022) (quoting *State v. Spratt*, 265 N.C. 524, 526 (1965)). This defense is also included specifically in our

State's pattern jury instructions for armed robbery. *See* N.C.P.I. - Crim 217.10.

If defendant was charged with robbery of the firearm Mr. Daniels possessed, he could have been entitled to assert this defense, as he had a bona fide claim of right or title to it. But there is no precedent in our law for the extension of this doctrine outside of the robbery context. It is simply inapplicable to the facts of this case and not an appropriate defense to homicide charges. Therefore, the trial court was not obligated to grant defendant's request for this instruction, and we find no error.

B.    Aggressor Doctrine Jury Instruction

Against the State's objection, the jury heard instructions on self-defense. The State requested, and was granted, a jury instruction as follows, describing the aggressor doctrine, which establishes an exception to the self-defense justification in homicides, with an illustration about the display of a firearm:

> Justification for lawful self-defense is not present if the person who uses defensive force or the person for whom the defendant claims to be acting in defense of, voluntarily enters into a fight with the intent to use deadly force.
>
> In other words, if one initially displays a firearm to his opponent intending to engage in a fight and intending to use deadly force in that fight and provokes use of deadly force against himself by an alleged victim, he is himself an aggressor and cannot claim that he acted lawfully to defend himself or a third person.

We review de novo a trial court's decisions on jury instructions and recognize that a requested jury instruction must be granted where its substance is "correct in itself" and "supported by the evidence." *Hicks*, 385 N.C. at 60 (quotation omitted).

"[N]o exact formula is required" when the trial court instructs the jury, but the instructions should be "in substantial accord with those approved by this [C]ourt." *State v. Watson*, 294 N.C. 159, 167 (1978) (citing *State v. Hammonds*, 241 N.C. 226, (1954)).

North Carolina has not historically allowed an aggressor using deadly force to regain the right to exercise lawful self-defense if the person to whom he directed aggression responds by using deadly force to defend himself. *See State v. Wetmore*, 298 N.C. 743, 750 (1970) (stating that, "[i]f one takes life, though in defense of his own life, in a quarrel which he himself has commenced with intent to take life or inflict serious bodily harm, the jeopardy into which he has been placed by the act of his adversary constitutes no defense whatever, but he is guilty of murder" (quotes omitted)). In the context of jury instruction, our Supreme Court has summarized its understanding of the doctrine as follows:

> The trial court's instruction to the effect that a defendant who was the aggressor using deadly force had forfeited the right to use deadly force in self-defense and that *a person who displays a firearm to his opponent with the intent to use deadly force against him or her and provokes the use of deadly force in response* is an aggressor for purposes of the law of self-defense does not constitute an inaccurate statement of the applicable North Carolina law.

*State v. Holloman*, 369 N.C. 615, 629 (2017) (emphasis added). In the jury instruction at issue here and included verbatim above, the trial court's language was, on its face, "in substantial accord" with this understanding of the doctrine. *Watson*, 294 N.C. at

167. Indeed, defendant agrees that "the given instruction regarding the display of a weapon was taken from *State v. Holloman*."

Defendant specifically contests the language beginning "if one initially displays a firearm" and argues: "Based on this language, the jury likely believed that if Mr. Waters was armed, he had no right to self-defense. But this is not the law." Defendant is correct that under our law being armed does not automatically make one an aggressor on its own. Certainly, defendant acted within his Second Amendment rights by keeping firearms at home for self-defense. However, unless defendant severely underestimates the average jury's reasonableness and intelligence, the instruction challenged here does not mislead in way he proposes. This instruction was far more precise and in keeping with the Court-approved *Holloman* language: "[I]f one initially displays a firearm to his opponent intending to engage in a fight and intending to use deadly force in that fight and provokes use of deadly force against himself by an alleged victim, he is himself an aggressor." In other words, to determine whether defendant was the aggressor, this jury was required to answer many questions of fact beyond whether defendant was armed: whether he displayed the firearm to Daniels, what he intended, and whether he provoked Daniels to use deadly force. These instructions were a sufficiently clear explanation of the law. Defendant's claim that the jury likely read it differently is unpersuasive.

Furthermore, defendant claims that, because the facts of *Holloman* were not

on all fours with our facts, the Supreme Court's understanding of the aggressor doctrine is inapplicable to this case. Not so. The trial court derived this instruction directly from the *Holloman* Court's analysis of whether a jury instruction communicated the substance of the applicable statutory law, not the section determining whether the facts of *Holloman* obligated a jury instruction on the doctrine. *Holloman*, 369 N.C. at 626–29. That Court was engaged in statutory construction, not fact-specific analysis. There are two distinct inquiries about a jury instruction's propriety: whether its substance was "correct in itself" and whether it was "supported by the evidence." *Hicks*, 385 N.C. at 60. To agree with defendant would be to collapse the two inquiries.

Our statutes provide for an exception to the aggressor doctrine, also discussed in detail in *Holloman* and included in the challenged instructions, whereby the "person who initially provokes the use of force against himself or herself" regains the right to self-defense where both of the following factual circumstances appear:

> (a) The force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force which is likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger.

> (b) The person who used defensive force withdraws, in good faith, from physical contact with the person who was provoked, and indicates clearly that he or she desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force.

N.C.G.S. § 14-51.4(2). The trial court's jury instructions on self-defense and the aggressor doctrine incorporated this statutory language nearly word-for-word. Accordingly, the court's jury instructions about the aggressor doctrine and its exception where the aggressor withdraws both communicated accurately the substance of our state law.

Our inquiry now turns to whether these instructions were "supported by the evidence." *Hicks*, 385 N.C. at 60. In short, the evidence tended to show the following: Defendant initiated a confrontation with Mr. Daniels by wordlessly raising his Sig Sauer P320 at him, causing Daniels to give chase across the neighboring properties and towards Slatestone Grocery. Then, defendant followed Daniels in pursuit, often with his gun pointed at him, and the two men then engaged in a physical fight in the Slatestone Grocery parking lot, throughout which defendant holstered his gun. Daniels then raised a gun towards defendant, seconds before defendant shot Daniels.

This Court "reviews de novo whether each element of the defense is supported by substantial evidence when taken in the light most favorable to the defendant." *Meader*, 377 N.C. at 162. It is uncontested that the trial court correctly issued self-defense instructions, because Mr. Daniels was shot with a loaded gun in his right hand. But because the confrontation began when defendant displayed a firearm at Daniels, and because defendant then pursued him through the streets, the law required the jury to determine whether the aggressor doctrine removed defendant's

right of self-defense, because it was a question of fact whether the State proved defendant intended to engage Daniels in a fight using deadly force, thereby provoking Daniels' use of force against him. However, because defendant holstered his gun during the physical scuffle, the jury had to make the factual inquiry into whether the State proved that this was not a withdrawal. And because Daniels raised a gun at defendant, the jury had to determine whether defendant "reasonably believe[d] that he . . . was in imminent danger of death or serious bodily harm[,]" whether he had "no reasonable means to retreat," and if shooting Daniels was "the only way to escape."

The trial court's task was to consider the sufficiency of this evidence, to determine which jury instructions were required, and then leave determinations about its weight to the jury. Therefore, in order to preserve defendant's Due Process rights and fully articulate every element the State had to prove beyond a reasonable doubt, the court was obligated to explain the law of self-defense, the aggressor doctrine, and the exception applicable where the defendant withdraws and cannot retreat. As discussed above, the instructions were accurate summaries of the law of North Carolina. Considering all the evidence *de novo* in the light most favorable to the defendant, we think it was sufficiently substantial to require instructions about each element of the defense. We agree that the trial court came to the correct conclusions on the questions reserved for the court and trusted the jury with the questions reserved for them.

The aggressor doctrine is rife with "complicated and thorny legal issues that call out for clarity." *Hicks*, 385 N.C. at 66. But "no exact formula is required" when the trial court instructs the jury, so long as the instructions are "in substantial accord with" the law. *Holloman*, 369 N.C. at 625 (quotes omitted). The trial court here looked at evidence that raised a slew of these thorny issues and properly instructed the jury with appropriate depth and precision. Defendant asked this court to reverse his conviction due to alleged errors in the jury instructions, because "cumulative errors lead to reversal when taken as a whole they deprived the defendant of his due process right to a fair trial free from prejudicial error." *State v. Lopez*, 264 N.C. App. 496, 510 (2019) (quotes omitted). But defendant has failed to show that the trial court erred at all. Therefore, we find no error either individual or cumulative.

### C. Defendant's Motion for Appropriate Relief

Defendant asserts that the State knew or should have known that Deputy Sitterson and Dr. Falls offered false testimony at trial and that the State violated his Due Process Rights by failing to correct the record. The trial testimony and extensive record of communications included with defendant's MAR do not support this argument.

Deputy Sitterson testified that he was not aware that the D.A.'s office made any subsequent request for drug testing. There is no evidence suggesting that he had any knowledge that would contradict this statement, and the same is clearly true as to Dr. Falls' testimony. Dr. Falls testified at trial that the State never personally

asked him to test the blood, and that he was unaware whether the State had made any similar request to anyone at his office. The correspondence included in the record confirms this testimony. Lt. Shackelford's emails do not include any requests that further testing be performed by the office, only whether samples were "still available *if further testing is requested* by the District Attorney's Office" (emphasis added). This is clearly not a request for further testing, but a conditional question leaving open the possibility of such a request. Because no evidence suggests that the testimony challenged here was false, no related Due Process issues arose having any effect on defendant's trial.

Defendant also argues that the toxicology report constitutes new evidence unknown, unavailable, and undiscoverable during the trial "having a direct and material bearing upon . . . defendant's guilt or innocence." N.C.G.S. § 15A-1415(c). There is sufficient information for us to conclude that the report would have been undiscoverable with due diligence during trial and that it was unknown and unavailable to him, because the report was not transmitted from the State's laboratory to the District Attorney until after trial concluded.

There is also sufficient evidence in the record to conclude that the toxicology report would not have had a material bearing upon the jury's verdict. Defendant testified to his knowledge of Daniels' history of drug charges, and defendant described Daniels as "incoherent" with a "wild look in his eye" and "gnashing his teeth" with "spittle coming out of his mouth." The apparent nature of Daniels' intoxication was

relevant to defendant's *mens rea* at the time of his actions; it was clearly important to defendant's testimony in his defense that Daniels exhibited behavior consistent with intoxication, and that defendant had knowledge of Daniels' previous drug use. But whether he was *actually* intoxicated is beside the point, because defendant's *mens rea* could have been formed only on the basis of Daniels' perceptible manifestations of intoxication. Accordingly, the admission of this evidence would have had no material bearing upon the truth or falsity of defendant's claims about his mental state.

Because defendant introduced testimony sufficient to support the reasonableness of his alleged belief that Daniels was intoxicated, it was in the jury's competence to weigh that testimony alongside the other evidence, including the video evidence that defendant nevertheless pursued Daniels across several properties with a firearm pointed at him. Therefore, defendant has not shown grounds for relief, and his motion is denied.

III.    Conclusion

For the above reasons, defendant's motion failed to show grounds for appropriate relief, and defendant failed to show error by the trial court. Therefore, we affirm the trial court's judgment.

NO ERROR.

Judges GORE and GRIFFIN concur.

Report per Rule 30(e).